TJOFLAT, Circuit Judge:
This is an appeal of a preliminary injunction barring enforcement of a Florida voter registration statute as being preempted by two different federal statutes. The state law would require as a precondition of registering to vote for the first time in Florida that the voter disclose her driver’s license number or the last four digits of her Social Security number on the registration application, and that this number match up with the number for this voter contained in the state driver’s license database or the Social Security Administration’s database, respectively. The district court held that plaintiffs, several organizations representing the interests of minority communities in Florida, had standing to challenge the statute, would likely succeed at trial on the merits of their claim that federal law preempts the enforcement of the state law, and would suffer irreparable injury absent provisional relief. Accordingly, the court preliminarily enjoined the enforcement of the state statute. We affirm the district court’s decision on plaintiffs’ standing to prosecute this action and reverse its decision granting the preliminary injunction.
I.
In the wake of the November 2000 presidential election and its attendant controversies, Congress undertook to review and reform the administration of federal elections. This legislative effort resulted in the Help America Vote Act of 2002, Pub.L. 107-252, 116 Stat. 1706 (codified at 42 U.S.C. § 15301 et seq.) (“HAVA”). Title III of HAVA, pertinent to this appeal, imposes a set of requirements upon the states in the areas of voter registration *1156 and election administration. The Act charges the states to implement its array of directives. See 42 U.S.C. § 15485. One such provision mandates that each state create a centralized, periodically updated database for its registration rolls, and that each registered voter must be linked to a unique identification number in this database. See 42 U.S.C. § 15483(a). Voters are required to provide on their registration application forms either the last four digits of their Social Security numbers or their driver’s license numbers; if a voter has been issued neither number, then the state is required to assign to that voter a unique identification number for entry into the database. See id. at § 15483(a)(5)(A). HAVA also directs each state to determine according to its own laws whether the information provided by the registrant “is sufficient to meet the [federal] requirements.” Id. at § 154S3 (a)(5) (A)(iii).
The state statute challenged in this case, Florida Statutes § 97.053(6) (“Subsection 6”), was enacted by the Florida legislature in 2005 and became effective on January 1, 2006, as part of Florida’s implementation of HAVA. As amended, Subsection 6 imposes a new verification process as a precondition of voter registration for first-time registrants in Florida. See Fla. Stat. § 97.053(6). Under Florida law, valid registration is a prerequisite to voting in elections. See Fla. Const, art. VI, § 2 (“Every citizen of the United States who is at least eighteen years of age and who is a permanent resident of the state, if registered as provided by law, shall be an elector of the county where registered.”); Fla. Stat. § 97.053(2) (“If the applicant fails to complete his or her voter registration application ... such applicant shall not be eligible to vote in that election.”). To be eligible to register to vote, a person must be a citizen of the United States, a permanent resident of Florida, over the age of eighteen, and not have been convicted of a felony or adjudicated mentally incapacitated. See Fla. Stat. § 97.041. Florida law also requires the voter to file her registration application at least twenty-nine days before a scheduled election, the so-called book closing date, in order to be eligible to vote in that election. See Fla. Stat. § 97.053(3)-(4); § 97.055.
To complete a registration form, the applicant must disclose certain personal identifying information, including the applicant’s name, home address, and date of birth. Additionally, both Subsection 6 and HAVA require each applicant to provide either her Florida driver’s license (or state-issued non-driver identification) number or the last four digits of the applicant’s Social Security number when registering to vote.[1] Subsection 6 also requires that before an application is accepted and the voter is listed as registered, the Florida Department of State must first verify or match the number provided in the application with the number assigned to the applicant’s name by the state Department of Highway Safety and Motor Vehicles (“DHSMV”) or the Social Security Administration (“SSA”).
The consequences of the matching procedure are at the center of this controversy. After a voter completes the registration application form and turns it in to the county election officials, the Department of State takes the information on the application form and compares it electronically against the information contained in the DHSMV and SSA databases.[2] If the information the applicant fills out on her registration form cannot be matched to the *1157 information held by the DHSMV or the SSA, the registration -will not be completed and the applicant will receive a brief and generic notification through the mail to that effect.[3]
What the voter must do to correct the mistake depends on the nature of the error, which unfortunately is not always made known to the applicant before she goes to correct it. If an error was made by the Department of State, e.g., during the data entry or matching process someone transposes two digits of a driver’s license number, then the applicant needs to present documentary proof, like a copy of her driver’s license or Social Security card, to the county Supervisor of Elections showing that the identification information she submitted in her application was correct. The voter can do this either before election day, or she can go to the polls on election day and cast a provisional ballot and then within two days bring the proof to the Supervisor of Elections. See Fla. Stat. § 97.053(6); § 101.048 (specifying the procedure for validating a provisional ballot).
However, if the error was made by the applicant herself — either by transposing digits in the entry of the driver’s license number or by entering a nickname or maiden name instead of the precise spelling of her legal name — then the only way to cure the defect and be eligible to vote in the upcoming election is by filing a new application with the correct information before the book closing date.[4] See Fla. Stat. § 97.052(6) (an applicant can correct any missing information on the registration form “up until the book closing [date] for [the] next election”); § 97.053(6) (a provisional ballot will be counted only if the applicant can verify the authenticity of the identification numbers “provided on the application”). There is no post-election way to fix an applicant-side error, and *1158 the provisional ballot cast by such a voter would not be counted because.the voter would have failed to register in time. See Fla. Stat. § 101.048(2)(b)2 (“If it is determined that the person voting the provisional ballot was not registered ... then the provisional ballot shall not be counted .....")[5]
II.
Plaintiffs are the Florida State Conference of the National Association for the Advancement of Colored People (“Florida NAACP”), the Southwest Voter Registration Education Project (“SVREP”), and the Haitian-American Grassroots Coalition (“HAGC”). All three plaintiff organizations work, among other goals, to increase voter registration and participation among members of racial and ethnic minority communities in Florida. The Florida NAACP and the HAGC are both umbrella organizations with local chapters throughout the state and have approximately 13,000 and 700 members statewide, respectively. SVREP is not a membership organization and has no members in Florida.
Plaintiffs filed this suit in the United States District Court for the Northern District of Florida and simultaneously moved for a preliminary injunction against the Florida Secretary of State, seeking to block the enforcement of Subsection 6 pri- or to the book closing date for the primary election held on January 29, 2008. The amended complaint raises a host of claims for relief under 42 U.S.C. § 1983, alleging that Subsection 6 violates the fundamental right to vote contained in the First and Fourteenth Amendments, the Equal Protection Clause of the Fourteenth Amendment, and the Due Process Clause of the Fourteenth Amendment. It also raises statutory claims, alleging that Subsection 6 conflicts with and is preempted by the following: section 303 of HAVA, 42 U.S.C. § 15483; section 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973; Title I of the Civil Rights Act of 1964, 42 U.S.C. § 1971(a)(2)(B); and the National Voter Registration Act, 42 U.S.C. § 1973gg-6.
The Secretary opposed the preliminary injunction and also moved to dismiss all of the counts in the amended complaint for failing to state claims upon which relief can be granted and for failing to establish that plaintiffs have standing under Article III of the Constitution to seek relief.
After expedited discovery, the district court held that plaintiffs have Article III standing in three different capacities. First, plaintiffs have standing to sue on their own behalf as organizations whose missions would be impeded and whose resources would be diverted as a direct result of the enforcement of Subsection 6. Second, the Florida NAACP and the HAGC also have standing as representatives of their members who are otherwise eligible voters but nonetheless face an imminent threat of being disenfranchised by enforcement of Subsection 6.[6] Third, the court held that plaintiffs also have third-party standing to sue on behalf of nonmember eligible voters in Florida who would be denied registration and hence the vote under Subsection 6.[7]
*1159 In a separate order and opinion, the district court granted plaintiffs’ motion for preliminary injunction. It found that plaintiffs are likely to succeed on the merits of their conflict preemption claims under HAVA and Title I of the Civil Rights Act of 1964, 42 U.S.C. § 1971, and that without a provisional remedy the plaintiffs would likely suffer irreparable harm once the book closing date passed.
Because the statutory claims under HAVA and § 1971 were sufficient to grant plaintiffs’ motion, the court avoided deciding whether the constitutional challenges were likely to succeed on the merits. However, the court held that plaintiffs’ factual allegations were sufficient to state constitutional claims for relief and thus denied the Secretary’s motion to dismiss those claims. On plaintiffs’ remaining two statutory claims — under Section 2 of the Voting Rights Act and under the National Voter Registration Act — the court granted the Secretary’s motion to dismiss. The Secretary now appeals the district court’s decision on standing and its order granting the preliminary injunction.[8]
III.
We first review whether any plaintiff has standing under Article III to invoke the jurisdiction of the federal courts to “decide the merits of the dispute or of particular issues.” Nat’l Alliance for the Mentally Ill, St. John’s Inc. v. Bd. of County Comm’rs, 376 F.3d 1292, 1294 (11th Cir.2004) (quoting Warth v. Seldin, 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975)). This limitation follows from Article Ill’s grant of judicial power to the federal courts to decide only “cases” and “controversies.” See Allen v. Wright, 468 U.S. 737, 750, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). The constitutionally minimum requirements for standing are three-fold. First, the plaintiff must have suffered, or must face an imminent and not merely hypothetical prospect of suffering, an invasion of a legally protected interest resulting in a “concrete and particularized” injury. Second, the injury must have been caused by the defendant’s complained-of actions. Third, the plaintiffs injury or threat of injury must likely be redressible by a favorable court decision. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992). The standing dispute in this case is entirely over the first factor, the demonstration of injury in fact.[9] Plaintiffs argued below and presently maintain that they have demonstrated the imminent threat of injury both to their members and to themselves.
*1160 A.
1.
An organization has standing to enforce the rights of its members “when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization’s purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.” Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 181, 120 S.Ct. 693, 704, 145 L.Ed.2d 610 (2000) (citing Hunt v. Washington State Apple Adver. Comm’n, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977)); see also Doe v. Stincer, 175 F.3d 879, 882 (11th Cir.1999). The Secretary does not challenge the germaneness prong of this inquiry, and we find that the interests of voters in being able to register are clearly germane to plaintiffs’ purposes. The Secretary likewise does not contest the third prong, and we are mindful that when the relief sought is injunctive, individual participation of the organization’s members is “not normally necessary.” United Food & Commercial Workers Union Local 751 v. Brown Group, Inc., 517 U.S. 544, 546, 116 S.Ct. 1529, 1531, 134 L.Ed.2d 758 (1996). The nub is whether the members themselves would have standing.
The Secretary argues that because plaintiffs have not identified any specific members who have had their registration denied due to a typographical or clerical error, the members and therefore plaintiffs lack associational standing. Plaintiffs respond that this information is understandably unavailable because they seek to prevent future harm to the large number of individuals likely to register in the upcoming elections in November 2008, among whom, plaintiffs contend, are likely to be members of their organizations.
In lawsuits seeking a remedy for past violations of an organization’s members’ rights, it makes sense that, after some discovery, the plaintiff be required to list at least one member who has been injured. But see Stincer, 175 F.3d at 884 (“[Ujnder Article Ill’s established doctrines of representational standing, we have never held that a party suing as a representative must specifically name the individual on whose behalf the suit is brought .... ”). The cases cited by the Secretary tend to support this proposition concerning past harms, but they do not necessarily extend the requirement of presenting specific injured members to claims of future harms. Anderson v. City of Alpharetta, 770 F.2d 1575 (11th Cir.1985) (per curiam), affirmed the district court’s holding that the NAACP lacked associational standing to assert the constitutional claims of its members because the organization had not been able to identify any member who had been prevented by the city’s putatively unconstitutional actions from living in public housing in Alpharetta. Id. at 1582-83. Likewise, National Alliance for the Mentally Ill, St. Johns Inc. v. Board of County Commissioners of St. John’s County, 376 F.3d 1292 (11th Cir.2004), also involved claims based on injuries allegedly caused by the defendant’s past violations. Id. at 1295. It is not surprising then that we affirmed dismissals in these cases for lack of standing because the organizational plaintiffs could not name specific members who have already been injured, as this inability to do so strongly supported the inference that no members were in fact injured.
The situation before us is different. When the alleged harm is prospective, we have not required that the organizational plaintiffs name names because every member faces a probability of harm in the near and definite future. The Supreme Court *1161 has accepted imminent harm as satisfying the injury-in-fact requirement of Article III standing. In Babbitt v. United Farm Workers National Union, 442 U.S. 289, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979), the Court stated that although a plaintiff must establish “a realistic danger of sustaining a direct injury as a result of the statute’s operation or enforcement,” id. at 298, 99 S.Ct. at 2308, he “does not have to await the consummation of threatened injury to obtain preventive relief.” Id. (quoting Ry. Mail Ass’n v. Corsi 326 U.S. 88, 93, 65 S.Ct. 1483, 1487, 89 L.Ed. 2072 (1945)); 31 Foster Children v. Bush, 329 F.3d 1255, 1265 (11th Cir.2003). “Imminence” as a doctrinal standard is “somewhat elastic,” Lujan, 504 U.S. at 564 n. 2, 112 S.Ct. at 2138 n. 2, and applying it is not an exercise in conceptual analysis but an attempt to advance the purposes behind the case-or-controversy requirement of Article III, including the guaranty of actual adversity between the parties, the limitation on the power of federal courts, see Midrash Sephardi, Inc. v. Town of Surfside, 366 F.3d 1214, 1223 (11th Cir.2004), and the reservation of judicial resources to resolve more concrete and pressing disputes, see Bowen v. First Family Fin. Servs., Inc., 233 F.3d 1331, 1340 (11th Cir.2000).
An imminent injury is one that is “likely to occur immediately.” 31 Foster Children, 329 F.3d at 1265. The alleged injury in this case, denial of voter registration and hence the right to have one’s vote counted, will occur if at all before the scheduled elections in November 2008. Plaintiffs have averred that they intend to increase voter registration efforts and anticipate increased registration applications ahead of the upcoming presidential election. This is sufficient to meet the immediacy requirement and distinguishes this case from the scenario in Elend v. Basham, 471 F.3d 1199 (11th Cir.2006). In Elend, the plaintiffs sought an injunction against the United States Secret Service to prevent the latter from restricting plaintiffs to sequestered “First Amendment zones” during future protests against President Bush. 471 F.3d at 1203. We upheld the dismissal for lack of standing because the plaintiffs failed to allege when, where, and how such protests were going to occur in the future. Id. at 1206-07. Given that judicial review of so-called time, place, and manner restrictions under the First Amendment are highly context-sensitive, see Clark v. Cmty for Creative Non-Violence, 468 U.S. 288, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984), it was proper to find that there was at that time no justiciable case or controversy. In contrast, plaintiffs here have alleged when and in what manner the alleged injuries are likely going to occur. Immediacy requires only that the anticipated injury occur with some fixed period of time in the future, not that it happen in the colloquial sense of soon or precisely within a certain number of days, weeks, or months. See Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 211-12, 115 S.Ct. 2097, 2105, 132 L.Ed.2d 158 (1995).
The requirement of immediacy is satisfied; substantial likelihood of future injury poses a different question. To be likely enough, the threatened future injury must pose a “realistic danger” and cannot be merely hypothetical or conjectural. How likely is enough is necessarily a qualitative judgment, see Wilderness Soc’y v. Alcock, 83 F.3d 386, 390 (11th Cir.1996), and courts should look for guidance from precedent in the analogical style of the common law tradition, see Allen v. Wright, 468 U.S. 737, 751-52, 104 S.Ct. 3315, 3324-25, 82 L.Ed.2d 556 (1984). The line of cases including and following City of Los Angeles v. Lyons, 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983), provides some guideposts on factors that are relevant to this assessment. In Lyons, the Supreme Court held that the plaintiff lacked stand *1162 ing to seek prospective injunctive relief against the City of Los Angeles to prevent the City’s police from applying a kind of choke hold on suspects absent a threat that the suspect would use deadly force to resist arrest. Lyons, 461 U.S. at 105, 103 S.Ct. at 1667.[10] Lyons alleged that the City authorized the police’s use of choke holds in violation of, among other constitutional provisions, the Due Process Clause of the Fourteenth Amendment, but the Court surmised that this policy even if present was not enough to establish a likelihood of future injury to Lyons. Id. at 106, 103 S.Ct. at 1667.
Several factors appear to undergird the Court’s denial of standing in Lyons. First, the Court noted that for the threatened injury to occur, a sequence of individually improbable events would have to occur: (1) Lyons would have to do something to cause another run-in with the Los Angeles police; (2) the city would have to have authorized all police officers to use choke holds unnecessarily; (3) the police officers in that specific encounter would have to use a choke hold; and (4) the use in that situation would have to have been unnecessary. See id. at 105-06, 103 S.Ct. at 1667. Each event’s occurrence was spatially and temporally indeterminate, as opposed to being fixed to either occur or not occur at some time and place. This open-endedness and the number of independent events needed to bring about the alleged injury combined to cast the injury into the realm of conjecture and speculation. See id. at 108, 103 S.Ct. at 1668.
Second, the threatened injury in Lyons was predicated on the plaintiff first doing something that at least would give an officer probable cause to detain or arrest him. The Court voiced its hesitance to assume that the plaintiff will routinely violate the law in the future and thus be brought within arms’ reach of the police. See id. at 103, 103 S.Ct. at 1665. Third, there was an adequate remedy at law for the threatened injury in Lyons, namely a damages suit against the City and police should an officer unconstitutionally choke the plaintiff at some future point. Id. at 111, 103 S.Ct. at 1670.
Unpacking the Court’s basis for denying standing in Lyons reveals that there is no per se rule denying standing to prevent probabilistic injuries. Indeed, since Lyons we have repeatedly upheld plaintiffs’ standing when the alleged injury was prospective and probabilistic in nature. A year after Lyons was decided, we held that a mentally ill person who was not at the time in state custody had standing to challenge the constitutionality of an Alabama state practice of placing persons in county jails pending involuntary commitment proceedings. See Lynch v. Baxley, 744 F.2d 1452, 1457 (11th Cir.1984). Observing co-plaintiff Pearcy’s history of treatable but recurrent psychopathology, we noted that “there is every likelihood that any [commitment] petition filed against Pearcy would result in his incarceration in [county] jail.” Id. Ordinarily, a civil commitment petition would not land one in jail. But given the lack of mental health facilities in some counties, “it is highly likely that state officials will continue to employ the county jails to detain” the named plaintiffs and others. Id. The Lynch panel distinguished cases like Lyons on the basis that Pearcy and others like him could not exercise any form of conscious control over the likelihood of the threatened injury oc *1163 curring. Id. at 1457 n. 7; see also 31 Foster Children, 329 F.3d at 1266-67 (affirming standing of foster children to sue to enjoin future violations of substantive due process based on probability of children suffering future harm while in foster homes); Church v. City of Huntsville, 30 F.3d 1332, 1339 (11th Cir.1994) (distinguishing Lyons and affirming standing of homeless persons to sue for injunctive relief to prevent city from authorizing police harassment and arrest of homeless persons without cause). In sum, probabilistic harm is “enough injury in fact to confer ... standing in the undemanding Article III sense.” Tenn. Valley Auth. v. U.S. Envtl. Protection Agency, 278 F.3d 1184, 1207 (11th Cir.2002) (quoting N. Shore Gas Co. v. Envtl. Protection Agency, 930 F.2d 1239, 1242 (7th Cir.1991) (internal quotation marks omitted)).
Plaintiffs present two kinds of probabilistic injuries to their members. First, they claim that Subsection 6 illegally prevents voters whose registration applications fail to match, due to an error made either by them or by the state, from casting a regular ballot. Second, they claim that Subsection 6 illegally prevents voters whose applications fail to match due to their own mistake from casting a provisional ballot that ultimately gets counted.[11] The likelihood that any given individual will eventually be injured depends on the likelihood that an error of some kind will cause a mismatch. It is not entirely clear from the record what the relevant error rate is in Florida’s matching process. However, even using the numbers cited in the Secretary’s brief, we arrive at a rejection rate of about one percent.[12] Applying this one percent rate going forward, the odds that any given application will be rejected because of a mismatch is also one percent.
To satisfy the requirements of associational standing, all that plaintiffs need to establish is that at least one member faces a realistic danger of having his or her application rejected due to a mistaken mismatch. Given that the NAACP and SVREP collectively claim around 20,000 members state-wide, it is highly unlikely— even with only a one percent chance of rejection for any given individual — that not a single member will have his or her application rejected due to a mismatch.[13] Unlike the alleged threat of injury in Lyons, the “odds” of an injury occurring in this case does not depend on conjecture about how individuals will intentionally act in the future. Rather, the injuries are foreseeable and the expected results of unconscious and largely unavoidable human errors in transcription. Moreover, unlike in Lyons, the chain of events leading to the *1164 eventual injury does not begin with an assumption that someone will commit an illegal act; the chain begins when people try to register to vote.
Human fallibility being what it is, someone is certain to get injured in the end. By their nature, the kinds of mechanical, typographical mistakes that plaintiffs claim will illegally disenfranchise voters under Subsection 6 cannot be identified in advance. Cf. Sandusky County Democratic Party v. Blackwell, 387 F.3d 565, 574 (6th Cir.2004). We are thus faced with the choice of deciding this case on the merits now or waiting until thousands (if not more) of registrations are actually rejected just weeks before the scheduled presidential election in November 2008. This question of timing turns not on standing but on the related jurisdictional doctrine of ripeness. See Wilderness Soc’y, 83 F.3d at 390.
2.
Two considerations predominate the ripeness analysis: (1) “the hardship to the parties of withholding court consideration” and (2) “the fitness of the issues for judicial decision.” Ala. Power Co. v. U.S. Dep’t of Energy, 307 F.3d 1300, 1310 (11th Cir.2002) (quoting Abbott Labs. v. Gardner, 387 U.S. 136, 149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967)). Both considerations weigh decidedly in favor of reaching the merits of this appeal sooner rather than later. The Supreme Court has long since held that where the enforcement of a statute is certain, a preenforcement challenge will not be rejected on ripeness grounds. See Reg’l Rail Reorganization Act Cases, 419 U.S. 102, 143, 95 S.Ct. 335, 358, 42 L.Ed.2d 320 (1974). Since enforcement of Subsection 6 is automatic for all new voter registrants, there is no doubt that the statute will be enforced against some of plaintiffs’ members. The hardship to would-be voters is that if we require them to wait until after their applications have been rejected to challenge Subsection 6, there may not be enough time to reach a decision on the merits before the actual election.
Waiting until rejections flow in en masse also imposes hardships on the Secretary. If a court enjoins enforcement of Subsection 6 weeks or days before the November election, it may be severely burdensome for the state to reconstitute its registration lists in time. Worse yet, waiting might call into question the status of provisional ballots already cast by voters whose information failed to match because of a mistake on the application form itself, an error incurable under Subsection 6 but potentially trumped by federal law. Judicial involvement in vote-counting invariably invites ugly consequences with which Florida in particular is so painfully familiar.
As for the second factor, the claims on appeal are fit for adjudication because they are predominantly legal questions and the conflict preemption analysis does not require much factual development. See Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm’n, 461 U.S. 190, 201-03, 103 S.Ct. 1713, 1720-22, 75 L.Ed.2d 752 (1983). Subsection 6 is a straightforward statute, so we are not in a worse position for a lack of a state court construction of it. See id. We conclude that plaintiffs have standing to sue on behalf of their members.
B.
On their own behalf, plaintiffs contend that Subsection 6 will hinder their abilities to carry out their missions of registering voters in their respective communities. Specifically, plaintiffs argue that they will have to divert scarce time and resources from registering additional voters to helping applicants correct the anticipated myriad of false mismatches due to *1165 errors either by the Department of State or by the applicant. Moreover, they claim that Subsection 6 will decrease electoral participation in these communities by making it more difficult for eligible individuals to register to vote and thereby undermine the organizations’ goals. These injuries are different in kind from the alleged injuries to the organizations’ members, although both are traceable to the enforcement of Subsection 6.
In response, the Secretary makes two arguments. First, he contends that an assertion that Subsection 6 will impede voter registration efforts is not sufficiently concrete and particularized to meet Article Ill’s requirement of injury in fact. Second, he asserts that even if plaintiffs can demonstrate that it will shift resources away from new registrations to correct mismatches on prior applications, this shift will be an entirely self-inflicted injury. In support of his position, the Secretary relies principally on a recent district court opinion in Common Cause/Georgia v. Billups, 504 F.Supp.2d 1333 (N.D.Ga.2007), which held that organizations dedicated to registering voters do not have standing in their own right to challenge a voter ID law. Id. at 1372-73. The opinion in Billups, in turn, relies heavily on a district court opinion in Indiana Democratic Party v. Rokita, 458 F.Supp.2d 775 (S.D.Ind.2006), affd sub nom. Crawford v. Marion County Election Bd., 472 F.3d 949 (7th Cir.), cert. granted — U.S. —, 128 S.Ct. 33, 168 L.Ed.2d 809 (2007).
The Rokita court held that organizations cannot establish injury in fact through “imprecise and speculative claims concerning potential future actions” designed to compensate for the effects of the statute. 458 F.Supp.2d at 816. Any resources that the organizations do end up expending would, moreover, be based on that organization’s “sole and voluntary discretion.” Id. Although the Seventh Circuit affirmed the merits holding in Rokita, it expressly held that an organization suffers an injury in fact when a statute “compel[s]” it to divert more resources to accomplishing its goals. Crawford, 472 F.3d at 951. Moreover, the court held that “[t]he fact that the added cost has not been estimated and may be slight does not affect standing, which requires only a minimal showing of injury.” Id. (citing Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180-84, 120 S.Ct. 693, 704-06, 145 L.Ed.2d 610 (2000)).
In reaching its decision on standing, the Crawford court followed a line of cases beginning with Havens Realty Corp. v. Coleman, 455 U.S. 363, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982). Havens held that an organization has standing to sue on its own behalf if the defendant’s illegal acts impair its ability to engage in its projects by forcing the organization to divert resources to counteract those illegal acts.[14] Id. at 379, 102 S.Ct. at 1124-25; see also Haitian Refugee Center, Inc. v. Nelson, 872 F.2d 1555, 1561 n. 10 (11th Cir.1989). These injuries, the Court determined, were sufficiently concrete to be more than the “abstract social interests” not cognizable as injuries under Article III. See Havens, 455 U.S. at 379, 102 S.Ct. at 1124.
Plaintiffs have made a sufficient showing that they will suffer a concrete injury under Subsection 6. The organizations reasonably anticipate that they will have to *1166 divert personnel and time to educating volunteers and voters on compliance with Subsection 6 and to resolving the problem of voters left off the registration rolls on election day. These resources would otherwise be spent on registration drives and election-day education and monitoring. SVREP anticipates that it will expend many more hours than it otherwise would have conducting follow-up work with registration applicants because voters will have their applications denied due to matching failures. In HAGC’s case, compensating for the new obstacles created by Subsection 6 would divert substantial resources away from helping voters who may need language-translation assistance on election day. The Florida NAACP plans to register ten percent of the African-Americans eligible to vote in the upcoming election, and personnel that would otherwise be part of this registration effort would have to be diverted to resolving mismatches under Subsection 6. Instead of “abstract social interests,” the plaintiffs have averred that their actual ability to conduct specific projects during a specific period of time will be frustrated by Subsection 6’s enforcement. Even though the injuries are anticipated rather than completed events, they satisfy the immediacy and likelihood requirements for the same reasons as discussed in Section III.A, supra, and for those reasons, the Secretary’s argument that the organizational injuries are not concrete or particularized fails.
The Secretary’s second argument, that any diversion of resources in response to Subsection 6 is voluntary and hence not an injury, also fails to persuade. The Secretary attempts to draw a distinction between an act or law negating the efforts of an organization, which is admittedly an injury under Havens, and an act or law merely causing the organization to voluntarily divert resources in response to the law, which he claims is not an injury cognizable under Article III. This distinction finds no support in the law, and it misses the point. For the proposition that “voluntary” diversion of resources are not injuries, the district court in Billups cited an opinion from the Court of Appeals for the District of Columbia Circuit stating that costs of using individual “testers” to ferret out racial discrimination in employment cases cannot count toward the injury in fact requirement. See Fair Employment Council of Greater Washington, Inc. v. BMC Mktg. Corp., 28 F.3d 1268, 1276-77 (D.C.Cir.1994). But this simply says that plaintiffs cannot bootstrap the cost of detecting and challenging illegal practices into injury for standing purposes. Costs unrelated to the legal challenge are different and do qualify as an injury, whether they are voluntarily incurred or not. The court expressly held that when a drain on an organization’s resources arises from “the organization’s need to ‘counteract’ the defendants’ assertedly illegal practices,” that drain is “simply another manifestation” of the injury to the organization’s noneconomic goals. Id. at 1277.
In this case, the diversion of personnel and time to help voters resolve matching problems effectively counteracts what would otherwise be Subsection 6’s negation of the organizations’ efforts to register voters. The net effect is that the average cost of registering each voter increases, and because plaintiffs cannot bring to bear limitless resources, their noneconomic goals will suffer. Therefore, plaintiffs presently have standing on their own behalf to seek relief.
IV.
We turn now to the merits of the appeal. Preliminary injunctions are reviewed for abuse of discretion, but the legal conclusions underpinning them are still subject to de novo review. See E. Remy Martin & Co., S.A. v. Shaw-Ross *1167 Int’l Imports, Inc., 756 F.2d 1525, 1529 (11th Cir.1985). Because we conclude that the federal statutes do not conflict with and preempt Subsection 6, and therefore that plaintiffs are unlikely to prevail on the merits of these claims at trial, we need not discuss the other factors of the preliminary injunction analysis.[15] This Part addresses preemption under HAVA; Part V discusses § 1971 of the Civil Rights Act of 1964.
Where the two conflict, federal law trumps state law; that was always clear. See U.S. Const, art. VI, cl. 2; Gibbons v. Ogden, 22 U.S. (9 "Wheat.) 1, 210-11, 6 L.Ed. 23 (1824). "What constitutes a conflict is often less clear. The well-worn taxonomy of preemption doctrine identifies three categories: (1) express preemption; (2) field preemption; and (3) conflict preemption. See Gade v. Natl Solid Wastes Mgmt. Ass’n, 505 U.S. 88, 98, 112 S.Ct. 2374, 2383, 120 L.Ed.2d 73 (1992) (O’Connor, J., concurring); Pharm. Research and Mfrs. of Am. v. Meadows, 304 F.3d 1197, 1205 (11th Cir.2002). Express preemption occurs when Congress manifests its intent to displace a state law using the text of a federal statute. See Meadows, 304 F.3d at 1205. Field and conflict preemption in turn have been considered under the umbrella term “implied preemption.” See Gade, 505 U.S. at 98, 112 S.Ct. at 2383. Field preemption occurs when a congressional legislative scheme is “so pervasive as to make the reasonable inference that Congress left no room for the states to supplement it.” Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947). Conflict preemption occurs either when it is physically impossible to comply with both the federal and the state laws or when the state law stands as an obstacle to the objective of the federal law. See Crosby v. Nat’l Foreign Trade Council, 530 U.S. 363, 372-73, 120 S.Ct. 2288, 2294, 147 L.Ed.2d 352 (2000).
Categories and labels are helpful, but only to a point, and they too often tend to obfuscate instead of illuminate. In this particular area, the Supreme Court has acknowledged the misleading nomenclature for its categories and conceded that “field preemption may be understood as a species of conflict pre-emption.” English v. General Elec. Co., 496 U.S. 72, 79, n. 5, 110 S.Ct. 2270, 2275 n. 5, 110 L.Ed.2d 65 (1990). Commentators have also questioned whether there is a meaningful distinction between “express” and “implied” preemption, since “when we say that a particular sequence of words in a statute ‘implies’ a given rule, we are merely saying that the rule is part of what that sequence of (express) words means in the context in which is appears.” Caleb Nelson, Preemption, 86 Va. L.Rev. 225, 263 (2000); see also Laurence H. Tribe, Constitutional Law § 6-25 at 481 n.14 (2d ed.1988) (noting that the “three categories of preemption are anything but analytically airtight,” and that “even when Congress declares its preemptive intent in express language, deciding exactly what it meant to preempt often resembles an exercise in implied preemption analysis”).
At bottom this is a case about statutory interpretation, viz., whether Congress intended either HAVA or § 1971(a)(2) of the Civil Rights Act to displace state laws like Subsection 6. The Secretary urges us to apply a presumption against preemption because states have *1168 traditionally regulated elections. Although his observation of the states’ traditional role is well-taken, in practice it is difficult to understand what a presumption in conflict preemption cases amounts to, as we are surely not requiring Congress to state expressly that a given state law is preempted using some formula or magic words. See Irving v. Mazda Motor Corp., 136 F.3d 764, 769 (11th Cir.1998). Either Congress intended to displace certain state laws or it did not. Federal law is not obliged to bend over backwards to accommodate contradictory state laws, as should be clear from the Supremacy Clause’s blanket instruction that federal law is the “supreme Law of the land ... any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.” U.S. Const, art. VI, cl. 2. Thus, whether an area of law is one of traditional state regulation does not affect whether we will put a thumb on the scale against giving effect to what Congress intended. But hewing to congressional intent cuts both ways. Although we will not apply a presumption to give less preemptive effect than Congress intended, we will also not apply an overly broad construction of the statute’s supposed objectives to give more than Congress intended.
HAVA represents Congress’s attempt to strike a balance between promoting voter access to ballots on the one hand and preventing voter impersonation fraud on the other. Plaintiffs argue that Subsection 6 conflicts with this balance in three separate instances. First, plaintiffs argue that HAVA section 303(a) conflicts with Subsection 6. Section 303(a) sets forth the requirements for the creation of new state voter registration databases. See 42 U.S.C. § 15483(a). It requires states to keep up-to-date and accurate rolls of registered voters and to eliminate redundant entries. See id. § 15483(a)(4). Another provision of the subparagraph also requires registration applicants to provide a unique identification number — either a driver’s license number, a Social Security number, or a unique number assigned specifically for this purpose — and requires the state to verify this number on new voter registration applications in accordance with a procedure of the state’s choosing. See id. § 15483(a)(5).
Plaintiffs contend that the objective of section 303(a) is to ensure that states keep accurate records of registered voters, and that it was not intended to prescribe matching as a federal precondition for voter registration. Further, plaintiffs argue that Florida misunderstood what section 303(a) required and consequently acted as though HAVA mandated matching as a precondition to registration, resulting in the enactment of Subsection 6. The negative implication of section 303(a)’s actual objective is, so it goes, that HAVA prohibits states from using the identification verification process as a basis for excluding otherwise eligible voters. Assuming that plaintiffs are right that section 303(a)(5) of HAVA does not impose matching as a requirement of voter registration, it also does not seem to prohibit states from implementing it. See 42 U.S.C. § 15483(a)(5)(A)(iii) (“The State shall determine whether the information provided by an individual is sufficient to meet the requirements of this subparagraph, in accordance with State law.”). Neither test of conflict preemption pans out for the plaintiffs. It is certainly possible to comply with both HAVA section 303(a) and Subsection 6. Indeed, if plaintiffs are correct that section 303(a) is really just concerned with managing databases, then it has nothing whatsoever to do with the registration requirements of Subsection 6 and cannot be in conflict with it. Plaintiffs have failed to show how making matching a prerequisite to registration undermines the functioning of the database itself, which is, under plaintiffs’ own interpreta *1169 tion of the statute, the only objective of section 303(a).
Second, plaintiffs argue that HAVA section 303(b) also conflicts with Subsection 6. At the outset, it is important to point out a crucial difference between the subject matter of Subsection 6 and of section 303(b). Section 303(b) deploys HAVA’s provisions against voter impersonation fraud by imposing additional restrictions on those individuals who registered by mail before they can vote either a regular or a provisional ballot. It is not a federal registration provision. Every command in section 303(b) applies only to voters who have already registered — specifically, registered by mail instead of in person — -according to the laws of that voter’s state. Simplified, section 303(b) requires voters who registered by mail to verify their identify in any one of three ways before casting a regular ballot. First, the voter can present some form of identification from a pre-approved statutory list at the polling location (or send a copy of the identification with her mail-in vote). See 42 U.S.C. § 15483(b)(2)(A). The second and third ways of verifying identity in order to vote occur at the point of registration, but they are not registration requirements under section 303(b).[16] A voter can verify her identity either by presenting the same forms of acceptable identification or by matching up one of her identification numbers (driver’s license or Social Security) when she registers to vote. Id. § 15483(b)(3)(A)-(B).[17] Nothing in this provision states or suggests that Congress intended to alter state registration requirements, and certainly nothing in the section suggests that voters can bypass state registration requirements entirely as long as they satisfy federal identification requirements for voting a regular ballot.
To succeed on this argument, plaintiffs would have to demonstrate how a provision dealing exclusively with voting requirements can be transformed to conflict with a state statute on registration requirements. The only argument made for a textual conflict is that upholding Subsection 6 would render HAVA section 303(b)(3)(B) superfluous. Plaintiffs contend that this section, which exempts those voters who pass the matching requirement at registration from showing identification at voting, would be unnecessary if Subsection 6 stands because every voter would need to match their Social Security or driver’s license numbers at registration. This utterly misapplies the familiar canon of construction that “a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.” TRW Inc. v. Andrews, 534 U.S. 19, 31, 122 S.Ct. 441, 449, 151 L.Ed.2d 339 (2001) (quoting Duncan v. Walker, 533 U.S. 167, 174, 121 S.Ct. 2120, 2125, 150 L.Ed.2d 251 (2001) (internal quotation marks omitted)). This canon applies when courts are discerning the meanings of different provisions of the same statute, and it instructs that no portion of the statute should be read that would make another part unnecessary. Clearly this is not the case here. Plaintiffs offer no authority or reason to support an application of this canon to two different statutes from two separate sovereigns, and such an approach would be untenable anyway. If courts were to adopt plaintiffs’ interpretive method, then every *1170 federal statute that is consistent and parallel with a state statute would, paradoxically, have the opposite effect of preempting the state statute since the state statute would otherwise make the federal statute superfluous.
Third, plaintiffs argue that Subsection 6 conflicts with HAVA section 303(b)(2)(B)’s so-called fail-safe voting provision, which states that “[a]n individual who desires to vote in person, but who does not meet the [identification] requirements ... may cast a provisional ballot” as described in section 302(a) of HAVA. 42 U.S.C. § 15483(b)(2)(B)(i). Section 302(a) of HAVA, in turn, provides that a voter who “does not appear on the official list of eligible voters for the polling place” or who is claimed by the election official not to be an eligible voter, can cast a provisional ballot upon affirming that the voter is registered and is eligible to vote. See 42 U.S.C. § 15482(a). Once the provisional ballot is cast, the election official is to determine whether the individual is “eligible under State law to vote,” and the official must count the ballot if the voter is eligible. See id. § 15482(a)(4).
It is not entirely clear what plaintiffs’ interpretation of HAVA’s provisional ballot provisions is, or where they think the conflict with Subsection 6 lies. HAVA section 302(a) describes general procedures for casting and reviewing provisional ballots; it does not impose any federal standards on voter registration or voter eligibility, both of which remain state decisions. Subsection 6 itself states that a voter who has failed to register due to a mismatch of the identification numbers can cast a provisional ballot, which will be counted if the voter can verify the information provided within two days of the election date. See Fla. Stat. § 97.053(6). HAVA section 302(a) expressly states that a provisional ballot be counted only if the voter is eligible under state law to vote in that particular election. Registration is an eligibility requirement under the Florida constitution and statutes. See Fla. Const, art. VI; Fla. Stat. § 97.053(2). Subsection 6’s provisional ballot measures are consistent with HAVA section 302(a), as both statutes would count only those provisional ballots cast by voters who were eligible — in Florida, registered — to vote in the election.
Perhaps plaintiffs interpret HAVA to mean that any voter eligible to register under state law is entitled to have her provisional ballot count under section 302(a). Commentators have called this interpretation the “substantive vision of provisional voting,” which means that “the provisional ballot should count whenever the individual who casts the ballot is someone who substantively has the qualifications necessary to be a registered voter.” Edward B. Foley, The Promise and Problems of Provisional Voting, 73 Geo. Wash. L.Rev. 1193, 1194 (2005).[18] Such an interpretation would turn section 302 into a sweeping federal invalidation of state voter registration requirements, and while textually plausible it is not, in our judgment, the intent of Congress in enacting HAVA section 302.
Section 302 states that a voter wishing to cast a provisional ballot must be “registered” to vote in her state and must execute a written affirmation to that effect. It is only after the voter affirms that she is registered and is eligible to vote that she *1171 can even fill out a provisional ballot. These parts of section 302 in clear terms indicate that Congress did not intend to do away with the importance and consequences of state registration requirements. Once the provisional ballot has been cast, the state election officials must then “determine[ ] that the individual is eligible” to vote before counting the ballot. 42 U.S.C. § 15482(a)(4).
It is worth noting that although Congress drew a distinction between a voter being registered and a voter being eligible earlier in the same subsection, see id. § 15482(a)(2)(A)-(B), the verification subsection speaks only of determining whether a voter is “eligible under State law,” not whether the voter ever successfully registered. It is plausible to interpret this subsection, and its omission of two words like “and registered,” to mean that Congress rewrote all state voter registration law to be nonmandatory for voters wishing to cast a (provisional) ballot, in effect adopting the procedural vision of provisional voting, see supra note 18. Indeed this seems to be the dissent’s understanding of Congress’s intent behind this provision. See post at 1178 n.ll. But an equally plausible textual interpretation that is more consistent with congressional intent evidenced by the rest of HAVA is that by the term “eligible under State law,” Congress intended to incorporate state law on the issue instead of creating a federal standard. In other words, section 302(a) lets the states decide whether a voter who is not registered but is otherwise eligible to vote should have her provisional ballot counted anyway. Cf. Sandusky County Democratic Party v. Blackwell, 387 F.3d 565, 576 (6th Cir.2004) (discussing state law that may permit voters to cast provisional ballots outside of their registered precincts). Thus, under HAVA section 302, states can still choose whether they will effectively waive the registration requirement for voters casting provisional ballots. Florida has chosen not to do so, see Fla. Stat. § 97.041(l)(a)(5); id. at § 97.041(l)(b)(3), and that decision conflicts with neither section 302(a) nor with section 303(b)(2)(B) of HAVA.[19]
It is appropriate now to look through a wider lens, lest we miss the forest of Congress’s intent for the trees of HAVA’s clumsy subsections and clauses. Plaintiffs’ preemption argument comes down to the claim that HAVA presents a fixed federal standard for the identification requirements that states may impose on individual voters, and that any state standard more demanding or burdensome must give way. Subsection 6 is and was intended to be such an identity verification provision that is unquestionably more demanding and less flexible than the alternative methods of identity verification provided by HAVA. The question remains whether Subsection 6 sufficiently impedes HAVA’s objectives as to be preempted by it. See Gade v. Nat’l Solid Wastes Mgmt. Ass’n, 505 U.S. 88, 98, 112 S.Ct. 2374, 2383 120 L.Ed.2d 73 (1992) (“[The] ultimate task in any pre-emption case is to determine whether state regulation is consistent with the structure and purpose of the statute as a whole.”). Plaintiffs argue that HAVA’s standards for voter identification are in effect the national maximum (and presum *1172 ably minimum as well) that any state may impose on voters.
Reading HAVA Title III as a whole, we are not convinced that its objectives are to federalize voter identification standards. First, at multiple points throughout the statute, HAVA dynamically incorporates state law requirements instead of promulgating national standards. See 42 U.S.C. § 15482(a)(4); § 15483(a)(5)(A)(iii); § 15484; § 15485. Repeatedly adapting state laws does not' reflect an intent to prescribe a uniform national standard in the general legislative scheme. Second, section 304 of HAVA states explicitly that “[t]he requirements established by this subchapter are minimum requirements.” Id. § 15484. Plaintiffs point out that the section goes on to say that stricter state requirements for “election technology and administration” cannot be “inconsistent with the Federal requirements.” Id. Although this congressional hedge means that HAVA section 304 is not a silver bullet for the Secretary’s position, it also throws some doubt on plaintiffs’ claim that HAVA evinces a uniform national voter identification policy as it clearly contemplates the existence of requirements more restrictive than the federal minimum. As discussed above, plaintiffs have been unable to show how Subsection 6 is inconsistent with any of the specific “requirements” of HAVA. Their argument that it is inconsistent with some more nebulous conception of HAVA’s objective fails once we recognize that on issues relating to voter registration and identification not specifically addressed by HAVA, Congress essentially punted to the states.
Third, if HAVA were intended to preempt all state laws like Subsection 6, then we would expect to see a more comprehensive regulation of voter registration and identification. Instead, what we actually have in HAVA section 303(b) is a provision covering only mail-in registrants. There is nothing at all in the statute that discusses the requirements and procedures for establishing eligibility and identity of in-person registrants. Thus, so far as the specific requirements of HAVA section 303(b) are concerned, we must conclude that Congress left it entirely up to the states to prescribe the requirements for in-person registrants. Under plaintiffs’ own interpretation, section 303(b) would preempt Subsection 6 as applied to mail-in registrants whose Social Security and drivers’ license numbers failed to match, but not as applied to in-person registrants who had the same problem. Yet this would mean that section 303(b) would be more protective of mail-in registrants — the very group upon whom Congress imposed additional federal identification requirements to counteract greater perceived risks of impersonation fraud — than of in-person registrants in states like Florida. If Congress had wanted the verification methods described in section 303(b) to apply to all voters nationally, it would have said so. If it had intended even less demanding methods to apply nationally for in-person registrants, it would have said that as well. The fact that the statute addresses only one specific subgroup of registrants is more consistent with the Secretary’s interpretation of HAVA — that it created some minimum verification procedures for one specific group where concerns of fraud were particularly high but otherwise left the states free to draw up their own voter identification measures.
V.
We next consider whether Subsection 6 conflicts with § 1971(a) of the Civil Rights Act.[20] As with the analysis of *1173 HAVA, the task with § 1971(a) is determining whether Subsection 6 stands as an obstacle to the objectives of the federal statute. We conclude that it does not.
Section 1971(a)(2)(B) was originally enacted as part of Title I of the Civil Rights Act of 1964, Pub.L. 88-352, § 101, 78 Stat. 241. The measure was at the time the latest entry in a spurt of federal enforcement of voting rights after a long slumber following syncopated efforts during Reconstruction. Statutes enacted in 1870, 1871, 1957, and 1960 had all been unsuccessful attempts to counteract state and local government tactics of using, among other things, burdensome registration requirements to disenfranchise African-Americans. See Condon v. Reno, 913 F.Supp. 946, 949-50 (D.S.C.1995). This latest addition to federal law was “necessary to sweep away such tactics as disqualifying an applicant who failed to list the exact number of months and days in his age.” Id. at 950. Such trivial information served no purpose other than as a means of inducing voter-generated errors that could be used to justify rejecting applicants.
The requirements of Subsection 6 are, of course, not trivial or irrelevant in the way that the specific kinds of information requests targeted by Congress in enacting § 1971(a)(2)(B) were trivial. Although Subsection 6 does not present a paradigmatic violation of § 1971(a)(2)(B), we recognize that Congress in combating specific evils might choose a broader remedy. See Pa. Dep’t of Corrs. v. Yeskey, 524 U.S. 206, 118 S.Ct. 1952, 1956, 141 L.Ed.2d 215 (1998); N.H. Motor Transp. Ass’n v. Rowe, 448 F.3d 66, 77 (1st Cir.2006). The text of the resulting statute, and not the historically motivating examples of intentional and overt racial discrimination, is thus the appropriate starting point of inquiry in discerning congressional intent.
The text of § 1971(a)(2)(B) prohibits denying the right to vote based on errors or omissions that are not material in determining voter eligibility. See 42 U.S.C. § 1971(a)(2)(B). The term “material” not surprisingly signifies different degrees of importance in different legal contexts. In constitutionalized criminal procedure, exculpatory evidence is “material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.” United States v, Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985). In the voluminous jurisprudence of section 10b of the 1934 Securities Exchange Act and Rule 10b-5, a misrepresentation or omission is material if and only if there is a “substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the ‘total mix’ of information made available.” TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976).
However, in the federal criminal mail and wire fraud context, materiality seems to take on a much lower evidentiary threshold, for “a false statement is material if it has a natural tendency to influence, or is capable of influencing, the decision of the decisionmaking body to which it was addressed.” United States v. Gray, 367 F.3d 1263, 1272 n. 19 (11th Cir.2004) (quoting Neder v. United States, 527 U.S. 1, 15, 119 S.Ct. 1827, 1837, 144 L.Ed.2d 35 (1999) (internal quotation marks omitted)). Similarly, in the context of sentencing range enhancements for concealing evidence under the federal Sentencing Guidelines, we *1174 have observed that the threshold for materiality is “conspicuously low,” such that material information is “information that, if believed, would tend to influence or affect the issue under determination.” United States v. Dedeker, 961 F.2d 164, 167 (11th Cir.1992) (quoting U.S.S.G. § 3C1.1, comment, (n. 5) (internal quotation marks omitted)).
Roughly speaking, there appears to be two kinds of “materiality,” one similar to minimal relevance and the other closer to outcome-determinative. If materiality in the context of § 1971(a)(2)(B) means minimal relevance, then it is clear that a failure to match the information required under Subsection 6 is “material” to determining voter eligibility. An application that fails to match up the identification numbers tends to make it more likely that the applicant is not a qualified voter than if the numbers had matched.
If materiality means something more like outcome-determinative, then the Secretary would have to meet a higher burden in demonstrating that the information required to make a match is necessary or sufficient, along with other information available, to determining eligibility. Fortunately for the Secretary, Congress has already resolved this potentially difficult issue in his favor by enacting HAVA section 303(a). The fact that HAVA section 303(a) requires states to obtain the applicant’s identification numbers before accepting a registration application and also to “determine whether the information provided ... is sufficient to meet [that] requirement ]” indicates that Congress deemed the identification numbers material to determining eligibility to register and to vote.[21] 42 U.S.C. § 15483(a)(5)(A)(iii). Moreover, the section 303(a)(5) issues this directive to states “notwithstanding any other provision of law,” which of course includes the temporally prior § 1971(a)(2)(B). See 42 U.S.C. § 15483(a)(5)(A)(i). We doubt that Congress would mandate the gathering of information — indeed, that it would make that a precondition for accepting registration application — that it also deems immaterial. Read together, HAVA section 303(a) removes specific kinds of information from § 1971 (a)’s domain by making those kinds of information automatically material.[22]
Plaintiffs argue that whether or not the underlying information sought by the registration is material, an error caused by a typo cannot be material because it does not reflect the absence of any actual, substantive element that makes the applicant ineligible. The mistaken premise in this *1175 argument is that the materiality provision refers to the nature of the error rather than the nature of the underlying information requested. If plaintiffs were correct and materiality refers to the fact of the error itself, then no error would ever be material because an error by definition mistakenly and incorrectly represents the underlying substantive element of eligibility. A more sound interpretation of § 1971(a)(2)(B) asks whether, accepting the error as true and correct, the information contained in the error is material to determining the eligibility of the applicant. As discussed above, HAVA makes that information material.[23]
Ultimately, the thrust of plaintiffs’ argument is not that the information sought by HAVA and Subsection 6 are immaterial, but that the likelihood of error combined with the consequences are unjustifiably burdensome on the applicant in light of other available and more error-tolerant ways of verifying identity, and in light of the overall balance of effects on social utility. That is an argument for another day. Section 1971(a)(2)(B) does not establish a least-restrictive-alternative test for voter registration applications in the plain text of the statute, and we are unable to discern the imposition that tests as an objective of the statute. Finding no conflict between Subsection 6 and § 1971(a)(2)(B) of the Civil Rights Act, we conclude that the Florida law is not preempted.
VI.
For the foregoing reasons, we affirm the district court’s decision that plaintiffs have standing to prosecute this lawsuit, and we reverse its decision granting plaintiffs a preliminary injunction. The case is remanded for further proceedings not inconsistent herewith.
SO ORDERED.

. Those who affirm that they have neither a Social Security number nor a Florida driver's or identification number are not required to fill out that portion of the application but instead must provide a copy of an identifying document from a pre-approved list.

. Both state and federal agencies participate in the matching process. If the applicant *1157 supplied a Florida identification number (driver's license or non-driver identification issued by the DHSMV), the DHSMV will first attempt an automatic electronic match by comparing the identification number and the name of the applicant against the number and name in the DHSMV's database. The result will either be a match, nonmatch, or possible match. Possible matches are then reviewed by the Florida Bureau of Voter Registration Services within the Department of State, which will manually check the individual possible matches against the entries in the same DHSMV database. Nonmatches are returned to the Supervisor of Elections in each county for further review.
If the applicant supplied the last four digits of her Social Security number instead, her application information is forwarded to the SSA for verification. The SSA protocol compares the applicant’s Social Security number, first name, last name, and year and month of birth against the records in its database. All four elements have to match exactly with at least one entry for a living person in the SSA database to be considered a "match” by Florida. Entries that match only with deceased persons in the SSA database are further reviewed by the Bureau of Voter Registration Services, and all nonmatches are reviewed by the county Supervisors of Elections.

. Florida law requires officials to enter the information received from applicants within thirteen days of receiving the application. Fla. Stat. § 97.053(7). State law also provides that election officials must notify applicants within five business days of any failure to provide the necessary and correct information on the registration application. Fla. Stat. § 97.052(6). Thus, from the date the election officials receive the application, they have up to a maximum of eighteen days to notify the applicant of any error or omission — including a mismatch of the identification numbers — on the application.

. This rule has the practical effect of moving back the date before each election by which voters must register, which is currently set at twenty-nine days before the election. See Fla. Stat. § 97.055. Since there is always a risk of making a mistake on the form, applicants must know to file the application early enough so that they can be notified of a mismatch and refile the application before the book closing date.

.It goes without saying that this court's interpretation of Subsection 6 for the purposes of this challenge, including but not limited to the post-election curability of applicant-side errors, is subject to different, authoritative interpretations by the Florida state courts.

. Plaintiff SVREP acknowledges that it does not have associational standing because it is not a membership organization.

. As we are satisfied that plaintiffs have met Article Ill’s standing requirements under the alternative theories actually litigated — as representatives of their members and as organizations directly injured — we pretermit consid *1159 eration of the issue of whether plaintiffs have standing to litigate the claims of nonmembers in a representative capacity.

. The district court did not assess the likelihood of plaintiffs' success on the merits in their constitutional challenges, and neither side on appeal has briefed the constitutional merits issues. These issues are therefore not before us.

. Although the Secretary on appeal does not question the other two factors affecting standing, causation and redressibility, we review nostra sponte whether they are satisfied in this case and conclude that they are. If we accept the injury to be that Subsection 6 will hinder the organizations' ability to carry out their mission of registering eligible voters by forcing plaintiffs to divert time and resources needed to comply with the matching requirement, causation is apparent. An injunction against the enforcement of Subsection 6 would also redress this injury by doing away with the matching requirement, thereby freeing up the organizations to get on with their business. Because these two requirements of standing on plaintiffs' own behalf are met, we need not consider whether plaintiffs would also meet these two standing requirements under the associational or third-party theories.

. Although Lyons himself had been subject to such a choke hold on a prior encounter with the police, the Court, following its earlier decision in O’Shea v. Littleton, 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974), emphasized that "past wrongs do not in themselves amount to that real and immediate threat of injury necessary to make out a case or controversy.” Lyons, 461 U.S. at 103, 103 S.Ct. at 1666.

. Subsection 6 already provides that a voter can cast a provisional ballot and correct a mismatch if the mismatch was caused by a mistake by the Department; however, under state law if the mistake was on the application itself, no cure after the election date is possible.

. Data gathered between January 1, 2006, the effective date of Subsection 6, and September 30, 2007, show that there were 14,326 applications rejected for mismatches out of a total of 1,529,465 registration applications.

. Based on Florida voter registration data, about one percent of the total number of registration applications through September 2007 were rejected due to a mismatch. The same data reveal that the rate of rejection among African-Americans and Latinos was two percent. If there are even 200 individuals among the 20,000 members of the Florida NAACP and SVREP who are first-time regis- ' trants and thus subject to Subsection 6’s matching requirement, the probability that not even a single one will be rejected through the matching process is only thirteen percent, if we use the one-percent error rate. If we apply the two-percent rate of rejection for African-Americans and Latinos, the likelihood that at least one person out of 200 will fail to match increases to over ninety-eight percent.

. The precise issue in Havens was whether the organizational plaintiff had statutory standing to sue under section 812 of the Fair Housing Act of 1968, 42 U.S.C. § 3612. However, the Court noted that because section 812 had been interpreted to “extend to the full limits of Art. Ill,” the inquiry into statutory standing collapsed into the question of whether the injuries alleged met the Article III minimum of injury in fact. Havens, 455 U.S. at 372, 102 S.Ct. at 1121.

. The other factors include whether the plaintiffs will likely suffer irreparable injury absent an injunction, whether the threatened injury to the plaintiffs outweighs the harm the defendant suffers complying with the injunction, and whether the injunction would be adverse to the public interest. See Klay v. United Healthgroup, Inc., 376 F.3d 1092, 1097 (11th Cir.2004).

. This is not to be confused with HAVA section 303(a)'s requirement that states refuse to process or accept registration applications without either a driver's license number, the last four digits of the Social Security number, or a unique voter identification number. See 42 U.S.C. § 15483(a)(5).

. The subsection contains a third set of exceptions to the identification requirement created by other federal statutes that are inappo-site here. See 42 U.S.C. 15483(b)(3)(C).

. Contrast this with the "procedural vision” of provisional voting, which means that "if the local election board never officially registered an individual because of an incomplete registration form ... the individual is out of luck.” Edward B. Foley, The Promise and Problems of Provisional Voting, 73 Geo. Wash. L.Rev. 1193, 1195 (2005); see also id. ("The procedural vision of provisional voting ... mean[s] that if an omission were to be caused by voter error ... the individual would be stuck with the consequences.”).

. Under the dissent's interpretation of section 302(a), there would be no reason for Congress to include the requirement that the voter affirm that she “is a registered voter” since anyone eligible to register but who did not successfully register could still cast a provisional ballot. This interpretation greatly expands provisional voting beyond the group of voters it was intended to protect, namely those who had successfully registered but were still somehow left off the rolls. The provisional voters envisioned by the dissent would have already received notice that their applications were incomplete and that they are consequently not registered, making them ineligible to invoke section 302(a).

. The relevant portion of the statute reads:
(2) No person acting under color of state law shall—
*1173 (B) deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application [or] registration ... if such error or omission is not material in determining whether [the] individual is qualified under State law to vote in such election.
42 U.S.C. § 1971(a)(2)(B).

. To be sure, HAVA also does not require that states authenticate these numbers by matching them against existing databases. It is explicit that states are to make determinations of validity in accordance with state law. States are therefore free to accept the numbers provided on application form, which at least in Florida are completed with an oath or affirmation under penalty of perjury, as self-authenticating. This does not alter the materiality of the information itself.

. In a way, this issue in this case is the mirror image of the one decided in Schwier v. Cox, 412 F.Supp.2d 1266 (N.D.Ga.2005), aff'd 439 F.3d 1285 (11th Cir.2006). Schwier involved a challenge to Georgia’s Voter Registration Form, which had required the plaintiff applicants to disclose their full Social Security numbers to be verified. The district court held, and we affirmed, that the Georgia law conflicted with § 1971(a)(2)(B)'s materiality provision because Congress had made it illegal in a different statute, section 7(b) of the Privacy Act, 5 U.S.C. § 552a (note), to mandate the disclosure of one’s complete Social Security number without providing certain information and notice to the individual. See Schwier, 412 F.Supp.2d at 1274-75. Because the Georgia registration form ran afoul of the section 7(b) of the Privacy Act, the Social Security number was per se immaterial under § 1971(a)(2)(B). Here, because Congress required the identification numbers to be on voter registration applications, they are per se material under § 1971(a)(2)(B).

. The standard that the dissent proposes, that an error is immaterial if it would not “preclude a reasonable election official from identifying the applicant,’’ post at 1182, works only when the applicant has brought it to the election official’s attention that the mismatch is in fact an error by presenting proof of her identity and eligibility. Without this additional identifying information, such as a copy of the applicant's driver's license, it would be impossible to tell whether the applicant’s error was major, minor, or indeed an error at all (as opposed to an actual attempt at fraudulently registering). However, with this additional information, the election official will always be able to verify identity of the applicant. It is this additional information exclusively — and not the degree to which that new information deviates from the information on the registration application form, or the "nature of the error,” post at 1182 — that enables the election official to ascertain the identity of the voter. Thus, under this approach no error can ever be material.