JORDAN, Circuit Judge, concurring in part and dissenting in part.
 

 With one exception, I concur in and join the majority's opinion. My disagreement
 concerns the plaintiffs' standing to pursue class-based injunctive relief on the claim that the decontamination protocol of the Birmingham Police Department is unconstitutional. As I see things, there is a substantial likelihood that students in Birmingham high schools will-assuming the validity of the plaintiffs' claim-be improperly decontaminated in the future, and I would hold that the plaintiffs have standing to seek an injunction.
 

 For purposes of standing, we must accept the plaintiffs' claim that the Constitution requires SROs to decontaminate all students exposed to chemical spray by providing access to water, ventilation, and a clean change of clothes-and that SROs were not and are not doing all of these things due to the BPD's unconstitutional decontamination protocol.
 
 See
 

 Warth v. Seldin
 
 ,
 
 422 U.S. 490
 
 , 500,
 
 95 S.Ct. 2197
 
 ,
 
 45 L.Ed.2d 343
 
 (1975) ("Standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal[.]"). In contrast to the spraying claim, the adequacy of the decontamination protocol is not dependent on the constitutional validity of the use of Freeze +P in the first instance.
 

 I generally agree with the majority that the likelihood that a student will need to be decontaminated hinges on the likelihood of being sprayed or being exposed secondarily to spray. We know, however, that students will continue to encounter SROs at school.
 
 See, e.g.
 
 , D.E. 299 at 186 (discussing the number of SROs stationed at Birmingham high schools). And we also know that SROs will continue to use Freeze +P on students, which means that SROs will necessarily have to engage in decontamination efforts that will presumably be dictated by the BPD's protocol. It is therefore inevitable that, absent an injunction, SROs will continue to decontaminate students in an allegedly unconstitutional manner. The inadequate and allegedly unconstitutional decontamination protocol is akin to an unconstitutional policy that requires police officers to apply a chokehold to all citizens that they encounter.
 
 Cf.
 

 City of Los Angeles v. Lyons
 
 ,
 
 461 U.S. 95
 
 , 105-06,
 
 103 S.Ct. 1660
 
 ,
 
 75 L.Ed.2d 675
 
 (1983) ("To establish an actual controversy in this case, Lyons would have had ... to allege (1) that
 
 all
 
 police officers in Los Angeles
 
 always
 
 choke any citizen with whom they encounter ... or (2) that the city ordered or authorized police officers to act in such a manner.").
 

 The majority holds that a 1.77% likelihood of being sprayed (and of having to be decontaminated) is insufficient as a matter of law to satisfy
 
 Lyons
 
 ,
 
 461 U.S. at 108
 
 ,
 
 103 S.Ct. 1660
 
 . I am not convinced. Although tempting, it is unsound to reduce the "substantial likelihood" requirement for seeking injunctive relief to a purely quantitative (i.e., mathematical) analysis. Indeed, we have held that standing exists to prevent probabilistic injuries so long as those injuries are substantially likely to come to pass, and have framed the inquiry as qualitative: "How likely is enough [to satisfy the substantial likelihood of future injury requirement] is necessarily a qualitative judgment[.]"
 
 Fla. State Conf. of N.A.A.C.P. v. Browning
 
 ,
 
 522 F.3d 1153
 
 , 1162 (11th Cir. 2008).
 
 See also
 

 Sample v. Johnson
 
 ,
 
 771 F.2d 1335
 
 , 1343 (9th Cir. 1985) ("[B]ecause the conceptions of probability that have arisen in jurisprudence and in other branches of learning have far from achieved a perfect congruence, we prefer to describe 'probability' qualitatively, as requiring a very significant possibility, and not quantitatively, as mandating a 'greater than fifty percent' likelihood.") (internal citation omitted).
 

 Using the statistics presented at trial, on average about 138 Birmingham high school students have been sprayed or exposed to
 spray every year from 2006-2014-some without having done anything wrong-and have therefore been subject to allegedly unconstitutional decontamination efforts due to the BPD's protocol.
 
 See
 
 D.E. 298 at 164, 168. "Past behavior is the best predictor of future behavior,"
 
 Cordova v. Aragon
 
 ,
 
 569 F.3d 1183
 
 , 1205 (10th Cir. 2009) (O'Brien, J., concurring in part and dissenting in part), and those yearly instances of injury over an eight-year period constitute a fair predictor of future harm. After all, "what's past is prologue." William Shakespeare, The Tempest, act 2, sc. 1 (1611).
 
 Cf.
 

 Melendres v. Arpaio
 
 ,
 
 695 F.3d 990
 
 , 998 (9th Cir. 2012) (holding that Latino plaintiffs had standing to pursue class-based injunctive relief on their claim that the defendants had a practice, based on racial profiling, of detaining persons on suspicion of being unlawfully in the United: "[A]lthough ... the likelihood of a future stop of a particular individual plaintiff may not be 'high,' we are not convinced that the district court erred in determining that future injury was nevertheless 'sufficiently likely,' given the defendants' stated policy and practice.").
 

 Though not controlling because of its different facts, our decision in
 
 Browning
 
 is informative. In that case, organizations representing minority interests challenged a Florida voter registration statute which required each applicant to disclose specific identifying information that was then verified with information maintained by the state.
 
 522 F.3d at 1156
 
 . If the information provided did not match, the applicant would not be registered to vote unless certain corrective measures were timely taken. The organizations alleged that the voter registration procedure left applicants with too little time to fix the matching error before voter rolls closed in advance of an upcoming election, and sued to enjoin enforcement of the statute.
 

 Id.
 

 at 1157
 
 .
 

 With respect to the standing of the organizations, we first explained that "there is no per se rule denying standing to prevent probabilistic injuries."
 

 Id.
 

 at 1162
 
 . Then, recognizing that there was a mere one-percent chance that any given applicant would be rejected due to mismatched information,
 

 id.
 

 at 1163
 
 , we affirmed the district court's ruling that the organizations had standing to seek injunctive relief, even though they had not identified any specific applicants whose registrations were rejected. "Given that the NAACP and SVREP collectively claim around 20,000 members state-wide, it is highly unlikely-even with only a one percent chance of rejection for any given individual-that not a single member will have his or her application rejected due to a mismatch."
 

 Id.
 

 We distinguished the insufficient threat of future injury in
 
 Lyons
 
 because the odds of an injury occurring due to the registration statute did not depend on conjecture about how individuals would intentionally act in the future. "[T]he injuries are foreseeable and the expected results of unconscious and largely unavoidable human errors in transcription."
 

 Id.
 

 at 1163
 
 . In addition, the chain of events "leading to the eventual injury" did "not begin with an assumption that someone will commit an illegal act."
 

 Id.
 

 at 1164
 
 .
 

 The same, I submit, is true here. As explained above, the decontamination claim does not depend on conjecture about how students or SROs will intentionally act in the future. SROs can constitutionally use Freeze +P on students under certain circumstances, but not all of their deployments of spray have been appropriate.
 
 See
 
 D.E. 282 at 52 ("[T]he court concludes that there was simply no reason for Officer Smith to spray K.B. with Freeze +P.... No justifiable basis existed for Officer Benson to spray B.J. with Freeze +P."). But regardless of how a student has behaved, or whether an SRO has properly
 chosen to spray a student, decontamination of some kind will be necessary after Freeze +P is used, and SROs will resort to and follow the BPD's allegedly unconstitutional protocol.
 
 Cf.
 

 Lyons
 
 ,
 
 461 U.S. at 106
 
 ,
 
 103 S.Ct. 1660
 
 (explaining that a plaintiff could seek an injunction against police misconduct where the government "ordered or authorized police officers" to enforce an unconstitutional policy);
 
 Kenny v. Wilson
 
 ,
 
 885 F.3d 280
 
 , 290 (4th Cir. 2018) (rejecting argument that students lacked standing under
 
 Lyons
 
 to challenge "disturbing schools" and "disorderly conduct" laws in part because they alleged "that there will be future encounters with officers at school and that the statutes in question authorize defendants to violate their rights to due process and free speech").
 

 In my view, there is a substantial likelihood that, absent an injunction, SROs will continue to decontaminate Birmingham high school students in an allegedly unconstitutional manner. I would therefore hold that the plaintiffs have standing to pursue class-based injunctive relief with respect to their decontamination claim.