[PUBLISH]

In the

United States Court of Appeals

For the Eleventh Circuit

_____

No. 20-14540

_____

GEORGIA ASSOCIATION OF LATINO
ELECTED OFFICIALS, INC.,
as an organization,
GEORGIA COALITION FOR THE
PEOPLE'S AGENDA, INC.,
as an organization,
ASIAN AMERICANS ADVANCING
JUSTICE - ATLANTA, INC.,
as an organization,
NEW GEORGIA PROJECT,
as an organization,
COMMON CAUSE,
as an organization,

2                    Opinion of the Court                    20-14540

ALBERT MENDEZ,
LIMARY RUIZ TORRES,

                                                  Plaintiffs-Appellants,

*versus*

GWINNETT COUNTY BOARD OF
REGISTRATION AND ELECTIONS,
JOHN MANGANO,
STEPHEN DAY,
BEN SATTERFIELD,
BEAUTY BALDWIN,
ALICE O'LENICK,
BRAD RAFFENSPERGER,
in his official capacity as the Secretary of State of Georgia,

                                                  Defendants-Appellees.

————————————————

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:20-cv-01587-WMR

————————————————

Before WILLIAM PRYOR, Chief Judge, LAGOA, Circuit Judge, and SCHLESINGER,* District Judge.

LAGOA, Circuit Judge:

Plaintiffs—five organizations and two individual voters from Gwinnett County, Georgia—allege that absentee ballot applications and voting-related information should have been, but were not, provided in both English and Spanish to voters in Gwinnett County during the 2020 election cycle. This appeal asks us to determine whether Defendants—the Gwinnett County Board of Registrations and Elections, the Board's individual members, and Georgia Secretary of State Brad Raffensperger—violated § 203 and § 4(e) of the Voting Rights Act of 1965.

Section 203 of the Voting Rights Act, 52 U.S.C. § 10503, requires certain States and their political subdivisions to provide voting materials in languages in addition to English. Gwinnett County is subject to the requirements of § 203, and Plaintiffs seek relief under that section for all limited-English proficient, Spanish-speaking voters in Gwinnett County. Section 4(e), 52 U.S.C. § 10303(e), prohibits States from denying individuals who were educated in "American-flag schools" in a language other than English the right to vote because of an inability to understand English. Plaintiffs seek relief under § 4(e) for all limited-English proficient, Spanish-

---

* Honorable Harvey Schlesinger, United States Senior District Judge for the Middle District of Florida, sitting by designation.

speaking voters in Gwinnett County who were educated in Puerto Rico.

The district court dismissed Plaintiffs' claims for lack of jurisdiction and for failure to state a claim, and this appeal ensued. After careful review and with the benefit of oral argument, we vacate the district court's dismissal for lack of jurisdiction, and we affirm its dismissal for failure to state a claim upon which relief can be granted.

## I.    BACKGROUND

### A.  Factual Allegations

The individual Plaintiffs are United States citizens registered to vote in Gwinnett County.  Plaintiff Albert Mendez is a professional bass fisherman.  He was born in New York City and raised in Puerto Rico, where he attended Spanish-language schools. Plaintiff Limary Ruiz Torres is a part-time accountant.  She was born and raised in Puerto Rico, where she attended Spanish-language schools.  Neither Mendez nor Ruiz Torres can read English.

The organizational Plaintiffs are the Georgia Association of Latino Elected Officials, Inc. ("GALEO"), the Georgia Coalition for the People's Agenda, Inc., Asian Americans Advancing Justice–Atlanta, Inc., the New Georgia Project, Inc., and Common Cause. These organizations are engaged in "get-out-the-vote" activities and other voter registration efforts in Gwinnett County.  The individual and organizational Plaintiffs (collectively, "Plaintiffs") allege

that Defendants violated § 203, 52 U.S.C. § 10503, and § 4(e), 52 U.S.C. § 10303(e), of the Voting Rights Act during the 2020 election.

Defendants are the Gwinnett County Board of Registrations and Elections and its individual members (collectively, the "Gwinnett County Board of Elections"), and Georgia Secretary of State Brad Raffensperger ("Secretary Raffensperger" or the "Secretary"). The Gwinnett County Board of Elections administers elections in Gwinnett County, Georgia; its individual members are essentially election superintendents and responsible for conducting such elections. Secretary Raffensperger is Georgia's chief election official. In this capacity, Secretary Raffensperger is charged with overseeing and administering elections in Georgia. *See* O.C.G.A. § 21-2-50.

The Voting Rights Act of 1965, Pub. L. No. 89-110, 79 Stat. 437, prohibits various kinds of discrimination in voting. Section 4(e), which was enacted in 1965 as part of the original Voting Rights Act, provides, in relevant part:

> No person who demonstrates that he has successfully completed the sixth primary grade in a public school in, or a private school accredited by, . . . the Commonwealth of Puerto Rico in which the predominant classroom language was other than English, shall be denied the right to vote in any Federal, State, or local election because of his inability to read, write, understand, or interpret any matter in the English language . . . .

52 U.S.C. § 10303(e)(2).  Plaintiffs allege that Gwinnett County has a substantial population of Spanish-speaking voters who were educated in Puerto Rico and who are entitled to the protections of § 4(e).

In 1975, Congress amended the Voting Rights Act to include § 203.  Act of Aug. 6, 1975, Pub. L. No. 94-73, § 301, 89 Stat. 400, 402–03 (codified as amended at 52 U.S.C. § 10503).  Section 203(b) provides that "no covered State or political subdivision shall provide voting materials only in the English language." 52 U.S.C. § 10503(b)(1).  A State or political subdivision is a "covered State or political subdivision" if the Director of the Census determines that certain language minority population thresholds are met and that "the illiteracy rate of the citizens in the language minority as a group is higher than the national illiteracy rate."   *Id.* § 10503(b)(2)(A).  Finally, § 203(c) provides:

> Whenever any State or political subdivision subject to the prohibition of subsection (b) of this section provides any registration or voting notices, forms, instructions, assistance, or other materials or information relating to the electoral process, including ballots, it shall provide them in the language of the applicable minority group as well as in the English language.

*Id.* § 10503(c).

It is undisputed that Gwinnett County is a covered political subdivision pursuant to Section 203(b), and that whenever

Gwinnett County provides the materials or information described in § 203, they must be in both English and Spanish.  It is also undisputed that the State of Georgia is not a "covered State" under § 203(b).  *See* Voting Rights Act Amendments of 2006, Determinations Under Section 203, 81 Fed. Reg. 87,532 (Dec. 5, 2016).

In response to the public health crisis surrounding the spread of COVID-19 in early 2020, Secretary Raffensperger postponed Georgia's 2020 presidential primary election from March to May 2020.  After Georgia Governor Brian Kemp issued a statewide shelter-in-place order in April 2020, Secretary Raffensperger postponed the 2020 primary election again to June 9, 2020, in order to allow his office and the counties time to "shore up contingency plans, find and train additional poll workers, and make other preparations." With the election moved to June 9 and uncertainty regarding the spread of COVID-19, Secretary Raffensperger issued a press release encouraging Georgia voters to cast absentee ballots instead of voting in person on election day:

> Considering the health risks posed by COVID-19, Georgians should seriously consider submitting an absentee ballot by mail . . . . [T]he extra precautions necessary to preserve voter and poll worker health during the pandemic will result in long wait times and an increased health risk that could be avoided through absentee ballots . . . .

Under normal circumstances, absentee ballot applications are handled by county elections officials.  Due to concerns about

the effect of COVID-19, Secretary Raffensperger sought to facilitate the use of absentee ballots by using CARES Act[1] funds to mail two rounds of absentee ballot applications to active Georgia voters—the first round of approximately 6.9 million applications was mailed during the last week of March and a second round of approximately 323,000 applications was mailed on or about April 21. These applications were provided only in English.

Plaintiffs' allegations against Secretary Raffensperger are not limited to the two mailings of English-only absentee ballot applications. Plaintiffs also allege that "[a]ll election materials provided by the Georgia Secretary of State to Gwinnett County voters are English-only." Secretary Raffensperger "issues press releases that provide critical and substantive election-related information," and his official website "contains other critical information for Gwinnett County voters," which are provided only in English. While precinct cards, which "contain critical information" like a voter's polling place, voting districts, and change of address processes, are mailed to each voter upon registration by the relevant county board of registration and elections, they are also available—but only in English—on the Secretary's website. Further, Secretary Raffensperger is "responsible for providing election-related

---

[1] In response to the COVID-19 pandemic, Congress passed legislation providing emergency relief to workers, small businesses, and states. *See* Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. No. 116-136, 134 Stat. 281 (2020).

training for nursing homes," as well as "supplying election-related instructions—including those related to absentee voting—and supplies at nursing homes." All of the instructions and supplies provided to nursing homes by the Secretary are only in English.

Unable to read English, Mendez and Ruiz Torres allege that they mistook the Secretary's absentee ballot applications for "junk mail" and could not complete them.[2] They also allege that they cannot "read the English-only voter precinct card accessible via the Georgia My Voter Page, the English-only election notices and information posted on the Georgia Secretary of State's website, and other English-only election materials furnished to [them] by Defendants."

Plaintiffs' allegations relating to the Gwinnett County Board of Elections fall into two categories: (1) failure to translate into Spanish the Secretary's English-only materials and information, and (2) deficiencies in the English-to-Spanish translation function of the Board's own website. Regarding the first category, Plaintiffs allege that the Gwinnett County Board of Elections does not translate into Spanish any of the voting materials and voting-related information provided by the Secretary to voters in Gwinnett County, including the absentee ballot applications the Secretary mailed in March and April 2020, the absentee ballot application forms

---

[2] After the complaint was amended to add the individual Plaintiffs, the Gwinnett County Board of Elections mailed them bilingual absentee ballot applications, which they were able to complete.

available on the Secretary's website, the press releases issued by the Secretary, and other "critical information" posted on the Secretary's website. Plaintiffs also allege that the Gwinnett Board of Elections does not post in Spanish on its own website the election information posted by the Secretary on his website.

Regarding the second category, Plaintiffs allege that, while the Gwinnett County Board of Elections placed a bilingual absentee ballot application on its own website after this case was filed on April 13, 2020, "[t]o access that application, voters have to navigate" what Plaintiffs allege is "the [Board's] English-only website." Plaintiffs, however, concede that the website is not, in fact, English-only, as they allege that a Spanish-language computer-translated version of the website is accessible by clicking a box marked "English >" at the bottom right-hand corner of the webpage. Plaintiffs allege that the website also provides a computer-generated Spanish-language absentee ballot application if users click a button labeled "In English." But, Plaintiffs allege, that for limited-English proficiency, Spanish-speaking voters, it "would be difficult, if not impossible, . . . to navigate" the website, and that the English-to-Spanish translations themselves are "riddled with errors that could prevent Spanish-speaking voters from navigating the mail voting process."

Plaintiffs' two counts seek relief against both the Secretary and the Gwinnett Board of Elections. Count I asserts that the Secretary and the Gwinnett Board of Elections violated § 203 because

the Secretary mailed two rounds of English-only absentee ballot applications to Gwinnett County's voters, and "neither of the Defendants mailed a bilingual or Spanish translated version of the absentee ballot application" to any limited-English proficient, Spanish-speaking voter in Gwinnett County. Count I also asserts that Defendants violate § 203 "on an ongoing basis by disseminating English-only press releases and all other election-related information published on the Secretary of State's website, English-only voter precinct cards accessible to individuals logging on to the Georgia My Voter Page, and English-only election-related notices, instructions, and supplies to nursing homes, among other items." The asserted effect of the alleged ongoing violations of § 203 is to "deny equal access to voting by mail" to Gwinnett County's limited-English proficient, Spanish-speaking voters in the 2020 primary election and future elections. Count II asserts violations of § 4(e) based on the same conduct, although this claim is limited to Gwinnett County voters who attended school in Puerto Rico and are protected by § 4(e).

In addition to attorneys' fees and costs, Plaintiffs seek declaratory and injunctive relief. First, Plaintiffs seek declarations that Defendants are violating §§ 203 and 4(e) on an ongoing basis because they are providing "absentee ballot applications, press releases and all other election-related information published on the Secretary of State's website, voter precinct cards accessible to individuals logging on to the Georgia My Voter Page, and election-related notices, instructions, and supplies to nursing homes" only in

English to Gwinnett County voters (or those Gwinnett County voters protected by § 4(e)).  Second, Plaintiffs seek an injunction ordering Defendants to stop "all continuing violations" of §§ 203 and 4(e), to mail bilingual absentee ballot applications to certain Gwinnett County voters, and to provide "bilingual versions of press releases and all other election-related information published on the Secretary of State's website, bilingual voter precinct cards accessible to Gwinnett County voters logging on to the Georgia My Voter Page, and bilingual election-related notices, instructions, and supplies to nursing homes in Gwinnett County."

## B.  Procedural Background

In response to Secretary Raffensperger's mailing of the initial English-only absentee ballot applications, the organizational Plaintiffs sued under §§ 203 and 4(e) of the Voting Rights Act. They subsequently filed an amended complaint adding the individual Plaintiffs.

With the 2020 presidential primary election approaching, Plaintiffs filed an emergency motion seeking preliminary injunctive relief on April 20, 2020.  The motion requested that the district court "[e]njoin all continuing violations" of the Voting Rights Act and require the mailing of "accurately translated bilingual absentee ballot application[s] to Gwinnett County voters who were sent English-only applications or, alternatively, to all Gwinnett County voters who self-identified as 'Hispanic/Latino' when they registered to vote and all voters residing in all Gwinett County precincts

for which at least five percent of voters identified as Hispanic on their voter registration cards." Defendants responded that Secretary Raffensperger is not subject to § 203 of the Voting Rights Act and that the Gwinnett Board of Elections had no duty to translate the materials sent by the Secretary's office. Secretary Raffensperger further argued that § 4(e) did not require him to provide bilingual absentee ballot applications to Gwinnet County voters. The district court denied the motion, concluding that Plaintiffs were not likely to succeed on the merits of their claims.

Plaintiffs then filed a second amended complaint that expanded the list of challenged English-only practices and included new factual allegations, such as Secretary Raffensperger's sending of additional English-only absentee ballot applications and alleging that his office "may consider providing similar services for the primary runoff and November General Election." In response, Defendants filed motions to dismiss under Federal Rules of Civil Procedure 12(b)(1) for lack of standing and Rule 12(b)(6) for failure to state a claim upon which relief could be granted.

After the district court held a hearing on the motions to dismiss but before it had ruled on them, Plaintiffs sought leave to file a supplemental complaint to address two new developments. First, Plaintiffs alleged that Secretary Raffensperger had "launched an English-only online absentee ballot application portal—which Gwinnett County election officials [were] encouraging voters to use through a link on the county's website." Second, Plaintiffs

alleged that the Gwinnett County Board of Commissioners had voted to reject requests to mail absentee ballot applications to all of the county's active registered voters for the November 2020 general election and, instead, "encourage[d] Gwinnett County voters to use the Georgia Secretary of State's new English-only online absentee ballot application portal."

On October 5, 2020, the district court granted Defendants' motions to dismiss. In its order, the district court found that Plaintiffs lacked standing to pursue their claims because they did not suffer an injury in fact. The district court also determined that, even if they had suffered an injury, that injury was neither traceable to, nor redressable by, Defendants. Additionally, the district court found that Plaintiffs' claims were moot because Secretary Raffensperger was "not likely to take the same challenged action again, such that it would subject Plaintiffs to the same alleged harm in the future."

In the alternative, the district court concluded that, even if Plaintiffs had standing, they failed to state a claim under Rule 12(b)(6). In support of its conclusion, the district court explained that: (1) the State of Georgia is not subject to § 203 of the Voting Rights Act; (2) consequently, the Gwinnett Board of Elections had no duty to provide bilingual translations of the voting materials sent out by Secretary Raffensperger's office; and (3) the Secretary's actions did not violate § 4(e) of the Voting Rights Act by conditioning the right to vote on the ability to read or understand English.

Although the district court did not rule on the pending motion to supplement before issuing its order on the motions to dismiss, it discussed the substance of the new allegations in its order of dismissal. And the district court found that "[n]othing in Plaintiffs' Motion to File a Supplemental Complaint alter[ed] [its] conclusion." The district court explained that § 203 applied based on the covered entity providing materials, "not the possibility that voters within a covered jurisdiction may see or come across materials coming from outside it."

Plaintiffs timely appealed. Months later, after the parties filed their initial briefs to this Court, Governor Kemp signed Senate Bill 202 (Act 9) (2021) into law. The bill prohibits the Secretary of State from sending absentee ballot applications unless requested by the voter and, according to Plaintiffs, requires the Secretary's office to provide a statewide online absentee ballot application portal. O.C.G.A. § 21-2-381(a)(1)(C)(i)–(ii) (effective July 1, 2021).

## II.    STANDARD OF REVIEW

We review *de novo* the district court's grant of a motion to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction, *Parise v. Delta Airlines, Inc.*, 141 F.3d 1463, 1465 (11th Cir. 1998), and we review *de novo* the district court's grant of a motion to dismiss under Rule 12(b)(6) for failure to state a claim, *Hill v. White*, 321 F.3d 1334, 1335 (11th Cir. 2003). In our *de novo* review, we accept the allegations in the complaint as true and construe the

facts in the light most favorable to the plaintiff. *Parise*, 141 F.3d at 1465; *Hill*, 321 F.3d at 1335.

In the context of a Rule 12(b)(1) challenge to standing, "we typically confine our standing analysis to the four corners of the complaint" but "we may look beyond it when we have before us facts in the record." *Corbett v. Transp. Sec. Admin.*, 930 F.3d 1225, 1235 (11th Cir. 2019).

Finally, to survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Establishing plausibility requires "more than a sheer possibility that a defendant has acted unlawfully." *Id.*

### III.    ANALYSIS

On appeal, Plaintiffs contend that the district court erred in dismissing their second amended complaint both for lack of standing under Rule 12(b)(1) and for failure to state a claim under Rule 12(b)(6). We address these issues in turn.

### A.  Jurisdiction

Article III of the Constitution limits the subject-matter jurisdiction of federal courts to "Cases" and "Controversies." U.S. Const. art. III, § 2. "To have a case or controversy, a litigant must establish that he has standing." *United States v. Amodeo*, 916 F.3d 967, 971 (11th Cir. 2019). The "irreducible constitutional

minimum" of standing consists of (1) an injury in fact that (2) is fairly traceable to the challenged action of the defendant and (3) is likely to be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). These three elements "are not mere pleading requirements but rather an indispensable part of the plaintiff's case." *Id.* at 561.

"Standing is determined at the time the plaintiff's complaint is filed," *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1340 (11th Cir. 2014), but it must persist throughout a lawsuit. If a case "no longer presents a live controversy with respect to which the court can give meaningful relief," the case is moot and must be dismissed. *Friends of Everglades v. S. Fla. Water Mgmt. Dist.*, 570 F.3d 1210, 1216 (11th Cir. 2009) (quoting *Fla. Ass'n of Rehab. Facilities, Inc. v. Fla. Dep't of Health & Rehab Servs.*, 225 F.3d 1208, 1217 (11th Cir. 2000)).

A district court has "substantial authority. . . to weigh the evidence and satisfy itself as to the existence of its power to hear [a] case" when deciding a Rule 12(b)(1) motion. *Morrison v. Amway Corp.*, 323 F.3d 920, 925 (11th Cir. 2003) (quoting *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990)). However, if a jurisdictional challenge implicates the merits of the underlying claim, such as here where interpretation of the Voting Rights Act will determine the merits as well as whether Plaintiffs have standing, "[t]he proper course of action for the district court . . . is to find that jurisdiction exists and deal with the objection as a direct attack on

the merits of the plaintiff's case." *Id.* at 925 (omission in original) (quoting *Garcia v. Copenhaver, Bell & Assocs., M.D.'s, P.A.*, 104 F.3d 1256, 1261 (11th Cir. 1997)).

Plaintiffs contend that each of them has standing; Defendants counter that none do. We need not parse each Plaintiff's standing, however, because one—GALEO—has standing, under a diversion of resources theory, to assert all of the claims in the second amended complaint. "Because of the presence of this plaintiff, we need not consider whether the other individual and [organizational] plaintiffs have standing to maintain the suit." *See Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 n.9 (1977).

### 1. *Injury In Fact*

To establish an injury in fact, a plaintiff must show that he "suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan*, 504 U.S. at 560). A "concrete" injury is one that actually exists—it is "real," as opposed to "abstract." *Id.* at 340 (quoting *Black's Law Dictionary* 479 (9th ed. 2009); *Webster's Third New International Dictionary* 472 (1971); and *Random House Dictionary of the English Language* 305 (1967)). Intangible harms, such as those created by statute, can nevertheless be

concrete.[3]  *Id.* at 340.  The Supreme Court has "long recognized that a person's right to vote is 'individual and personal in nature'" and "'voters who allege facts showing disadvantage to themselves as individuals have standing to sue'" as they have alleged a concrete and particularized injury.  *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018) (quoting *Reynolds v. Sims,* 377 U.S. 533, 561 (1964) and quoting *Baker v. Carr*, 369 U.S. 186, 206 (1962)).

Future injuries can also be concrete.  A plaintiff seeking prospective relief to prevent future injuries must prove that their threatened injuries are "certainly impending."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401 (2013).  In other words, "the mere risk of future harm, standing alone, cannot qualify as a concrete harm—at least unless the exposure to the risk of future harm itself causes a *separate* concrete harm."  *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2210–11 (2021).

An organization can establish standing in two ways: (1) through its members (i.e., associational standing) and (2) through its own injury in fact that satisfies the traceability and redressability elements.  As relevant to this appeal, an organization can establish its own injury in fact under a diversion of resources theory.  *See Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1249–50 (11th Cir.

---

[3] However, "Congress' role in identifying and elevating intangible harms does not mean that a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right."  *Spokeo*, 578 U.S. at 341.

2020) (analyzing both methods of establishing an injury). Under this theory, an organization has standing "if the defendant's illegal acts impair its ability to engage in its projects by forcing the organization to divert resources to counteract those illegal acts." *Id.* at 1250 (quoting *Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1165 (11th Cir. 2008)). To establish standing under a diversion of resources theory, an organizational plaintiff must explain where it would have to "divert resources away *from* in order to spend additional resources on combating" the effects of the defendant's alleged conduct. *Id.*; *cf. Browning*, 522 F.3d at 1166 ("These resources would otherwise be spent on registration drives and election-day education and monitoring."); *See Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1350 (11th Cir. 2009) (explaining that resources would be diverted "from 'getting voters to the polls' to helping them obtain acceptable photo identification" (alteration adopted)); *Ga. Latino All. for Hum. Rights v. Governor of Ga.*, 691 F.3d 1250, 1260 (11th Cir. 2012) (observing that an immigration organization "cancelled citizenship classes to focus on" increased inquiries about a new law).

As alleged in the second amended complaint, GALEO was founded in 2003, is headquartered in Georgia, and is "one of the oldest, largest, and most significant organizations promoting and protecting the civil rights" of Georgia's Latino community. Plaintiffs also allege that a "substantial amount of GALEO's civic engagement, voter registration and get out the vote work takes place in Gwinnett County." GALEO generally alleges that it has diverted

resources on an ongoing basis from these activities because Secretary Raffensperger and the Gwinnet County Board of Elections provide English-only election materials to limited-English proficient, Spanish-speaking voters in Gwinnett County. GALEO also specifically alleges that it "is reaching out to and educating [limited-English proficient,] Spanish-speaking voters about how to navigate the mail voting process and how to complete the application, as well as other aspects of the electoral process" and that "GALEO staff members such as Darrick Alvarez are assisting [limited-English proficient] voters who received English-only applications such as his parents and Nelson Romero with navigating the absentee voting process."

At this procedural stage, we must accept GALEO's allegations as true, *Tsao v. Captiva MVP Rest. Partners, LLC*, 986 F.3d 1332, 1337 (11th Cir. 2021), and we are satisfied that those allegations sufficiently plead the injury in fact element of standing. First, GALEO's broad allegation of diversion of resources is enough at the pleading stage. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (holding that an allegation in the complaint that the plaintiff organization "has had to devote significant resources to identify and counteract the defendant's" illegal practices was sufficient to confer standing to the organization in its own right at the pleading stage). Second, even if those allegations were not enough, GALEO's more specific allegations identifying the steps it is taking in response to Defendants' alleged illegal activities and the personnel it has assigned to help limited-English proficient, Spanish-

speaking voters who received English-only materials satisfy this element of standing. *See Browning*, 522 F.3d at 1165–66 (holding that organizations "made a sufficient showing that they will suffer a concrete injury" because they "reasonably anticipate[d] that they will have to divert personnel and time to educating volunteers and voters on compliance" with the challenged law). We therefore conclude that Plaintiffs have established a concrete injury sufficient to confer standing to challenge the Defendants' conduct.

However, even if a plaintiff suffers an injury in fact, that does not end the standing inquiry. We now must address whether Plaintiffs satisfy the traceability and redressability elements necessary for standing to pursue their claims.

### 2.  *Traceability and Redressability*

The injury must be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560-61 (alterations adopted) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976)). Moreover, "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision'" of the court. *Id.* at 561 (quoting *Simon*, 426 U.S. at 38, 43).

Plaintiffs claim that Defendants failed to provide bilingual voting materials and information to voters in Gwinnett County in violation of §§ 203 and 4(e) of the Voting Rights Act. As discussed above, at this stage of the case, GALEO sufficiently pleaded an

injury in fact for purposes of Article III standing—it had to divert resources to educate limited-English proficient voters in Gwinnett County about the English-only materials and information provided by Defendants. That injury is sufficiently traceable to Defendants' alleged violations of the Voting Rights Act and redressable by a favorable decision that Defendants must provide bilingual voting materials in future elections.

The district court, however, concluded that Plaintiffs' injuries, if they existed, could not be redressed by a favorable ruling because there "was . . . no legal obligation to provide the materials Plaintiffs request[ed]." In reaching that conclusion, the district court committed two errors.

First, whether Defendants have an obligation to provide certain bilingual materials to voters in Gwinnett County is the legal question at the center of this case. And in determining that Plaintiffs lacked standing on that basis, the district court improperly equated "weakness on the merits with the absence of Article III standing." *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 800 (2015) (quoting *Davis v. United States*, 564 U.S. 229, 249 n.10 (2011)). "To establish causation [for purposes of standing], a plaintiff need only demonstrate, as a matter of *fact*, 'a fairly traceable connection between the plaintiff's injury and the complained of conduct of the defendant,'" *Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1352 (11th Cir. 2005) (emphasis in original) (quoting *Parker v. Scrap Metal Processors, Inc.*,

386 F.3d 993, 1003 (11th Cir. 2004)), and an organizational plaintiff need only allege "a drain on an organization's resources" that "arises from 'the organization's need to "counteract" the defendants' assertedly illegal practices,'" *Browning*, 522 F.3d at 1166 (quoting *Fair Emp. Council of Greater Wash., Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1277 (D.C. Cir. 1994)). Here, GALEO alleged that the Secretary and the Gwinnett Board of Elections engaged in illegal conduct and that their conduct—failing to provide bilingual voting materials and information—caused GALEO to divert resources. Those allegations satisfy the traceability requirement of standing.

Second, the district court held that GALEO failed to establish standing under a diversion of resources theory based on our decision in *Jacobson v. Florida Secretary of State*, 974 F.3d at 1250. In *Jacobson*, this Court said that the plaintiffs did not "explain[] what activities [they] divert[ed] resources away from in order to spend additional resources on combatting" the alleged illegal conduct, "as precedent requires." *Id.* (emphasis omitted). The district court here reasoned that "there is no indication that GALEO would in fact be diverting any resources away from the core activities it already engages in by continuing to educate and inform Latino voters."

But the district court did not take into account the significance of *Jacobson*'s procedural posture. In *Jacobson*, the district court concluded that the organizational plaintiffs failed to establish

injuries based on a diversion of resources theory after holding a bench trial during which the witnesses' testimony did not provide evidence about which organizational activities were impaired by the allegedly illegal conduct. *See id.* at 1243, 1250. In contrast, this case comes before us at the pleading stage, and "[a]t the pleading stage, 'general factual allegations of injury' are enough." *Tsao*, 986 F.3d at 1337 (quoting *Lujan*, 504 U.S. at 561). As already discussed, GALEO's allegations exceed the allegations considered in *Havens* and, as this Court noted in *Jacobson*, *Havens* "concluded that these allegations were sufficient to establish standing at the pleading stage, but . . . [the Supreme Court] warned that at trial the organization would have to prove 'that it has indeed suffered impairment.'" *Jacobson*, 974 F.3d at 1249 (quoting *Havens*, 455 U.S. at 379 & n.21). *Jacobson*'s affirmance that the allegations were not proved at trial does not mean that GALEO's allegations were insufficient at the pleading stage.

We conclude therefore that GALEO had standing under a diversion of resources theory. Although we find the Plaintiffs had standing when the operative complaint was filed to pursue their Voting Rights Act claims, we must now determine whether their claims have been mooted.

### 3. *Mootness*

Mootness, like standing, is jurisdictional, as Article III's case and controversy requirement does not expire upon the filing of a pleading. If a case "no longer presents a live controversy with

respect to which the court can give meaningful relief," the case is moot and must be dismissed.[4] *Friends of Everglades*, 570 F.3d at 1216 (quoting *Fla. Ass'n of Rehab. Facilities*, 225 F.3d at 1217).

Plaintiffs concede that their challenges to the Secretary's mailing of English-only absentee ballot applications and the Gwinnett County Board of Elections' failure to translate those applications were mooted by the passage of Georgia Senate Bill 202. But other aspects of this case remain live. "Where one of the several issues presented becomes moot, the remaining live issues supply the constitutional requirement of a case or controversy." *Powell v. McCormack*, 395 U.S. 486, 497 (1969).

At this stage of the litigation, in which we must accept Plaintiffs' well-pleaded factual allegations as true, Plaintiffs allege that Defendants continue to violate §§ 203 and 4(e) by "disseminating English-only press releases and all other election-related information published on the Secretary of State's website, English-only voter precinct cards accessible to individuals logging on to the Georgia My Voter Page, and English-only election-related notices, instructions, and supplies to nursing homes, among other items."

---

[4] There is an exception to the mootness doctrine, not applicable here, for cases that are "capable of repetition, yet evading review." *Murphy v. Hunt*, 455 U.S. 478, 482 (1982). The exception is limited to situations where "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again." *Id.* (quoting *Ill. Elections Bd. v. Socialist Workers Party*, 440 U.S. 173, 187 (1979)).

And Plaintiffs' requested relief regarding these alleged ongoing statutory violations include an order requiring Defendants to "[p]rovide bilingual versions of press releases and all other election-related information published on the Secretary of State's website, bilingual voter precinct cards accessible to Gwinnett County voters logging on to the Georgia My Voter Page, and bilingual election-related notices, instructions, and supplies to nursing homes in Gwinnett County." These remaining claims present "a live controversy with respect to which the court can give meaningful relief, " and therefore are not moot. *Al Najjar v. Ashcroft*, 273 F.3d 1330, 1336 (11th Cir. 2001) (quoting *Fla. Ass'n of Rehab Facilities*, 225 F.3d at 1217)). Because we hold that Plaintiffs have standing to pursue their claims and the claims are not moot, we turn to address the merits.

## B. Merits

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). A claim is facially plausible when the alleged factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements[] do not suffice" to satisfy a plaintiff's burden to support the elements of his claim. *Id.*

While the district court dismissed Plaintiffs' claims for lack of jurisdiction, it alternatively concluded that they failed to state a claim upon which relief can be granted, finding that "[e]ven if Plaintiffs have standing, Plaintiffs still lose on the merits." For the reasons set forth below, we agree.

1. *Section 203 of the Voting Rights Act*

Pursuant to § 203(b), "no covered State or political subdivision shall provide voting materials only in the English language." 52 U.S.C. § 10503(b)(1). "A State or political subdivision is a covered State or political subdivision for the purposes of [subsection (b)] if the Director of the Census determines" that certain language minority population thresholds are met and "the illiteracy rate of the citizens in the language minority as a group is higher than the national illiteracy rate." *Id.* § 10503(b)(2)(A)–(B). Section 203(b) defines "voting materials" as "registration or voting notices, forms, instructions, assistance, or other materials or information relating to the electoral process, including ballots." *Id.* § 10503(b)(3)(A).

Section 203(b) establishes what a "covered State or political subdivision" cannot do. It does not, however, mandate any action. That is left to § 203(c), which provides:

> Whenever *any State or political subdivision subject to the prohibition of subsection (b) of this section* provides any registration or voting notices, forms, instructions, assistance, or other materials or information relating to the electoral process, including

ballots, it shall provide them in the language of the applicable minority group as well as in the English language . . . .

52 U.S.C. § 10503(c) (emphasis added).

Sections 203(b) and 203(c) use slightly different language to identify the entities subject to their requirements—"covered State or political subdivision" and "any State or political subdivision subject to the prohibition of subsection (b)," respectively. Whether Plaintiffs have a cause of action under § 203 depends on whether those terms refer to different entities.

It is undisputed that Gwinnett County is a "covered . . . political subdivision" under § 203(b), and that the applicable "language minority" is Spanish. 52 U.S.C. § 10503(b)(1). Thus, Gwinnett County cannot "provide voting materials only in the English language." It is also undisputed that Gwinnett County is governed by § 203(c)'s mandate such that whenever Gwinnett County provides the materials identified in that subsection, those materials must be in English and Spanish. Finally, it is undisputed that the State of Georgia is not a "covered State" under § 203(b), for Spanish or any other language minority. *See* 81 Fed. Reg. 87,532. Thus, § 203(b) does not prohibit Georgia from providing "voting materials only in the English language."

Plaintiffs assert, however, that § 203(c)'s mandate nonetheless applies to Georgia. Under Plaintiffs' reading, a State is "subject to the prohibition of subsection (b)" if it has within its borders a

"covered . . . political subdivision" even though the State itself is not a covered jurisdiction under § 203(b). In that circumstance, Plaintiffs contend that a State must provide bilingual voting materials to voters in any covered political subdivision within its borders, in this case Gwinnett County. Therefore, Plaintiffs argue that the State of Georgia must provide bilingual voting materials to voters in Gwinnett County.

In support of their reading of § 203(c), Plaintiffs argue that Congress could have used the "covered State or political subdivisions" language from subsection (b) if it had intended for subsection (c) to cover the same entities. Plaintiffs also note that "subject to" is defined as "affected by or possibly affected by (something)." *Subject to*, *Merriam-Webster*, https://www.merriam-webster.com/dictionary/subject%20to. Plaintiffs claim that the phrase "subject to," combined with the drafters' failure to use the identical language found in § 203(b), makes it clear that the statute requires noncovered States to provide bilingual election materials to voters in a covered political subdivision. According to Plaintiffs, the meaning is "so plain that this Court has already assumed" in *Delgado v. Smith*, 861 F.2d 1489 (11th Cir. 1988) "that the statute applies in these particular circumstances."

In *Delgado*, this Court affirmed the district court's denial of an injunction seeking to enjoin Florida state officials from conducting an election of a citizen initiative to amend the Florida state constitution. Opponents of the petition contended that the proposed

amendment was improperly on the ballot because the English-only petition circulated by its proponents failed to include a bilingual translation in § 203-covered political subdivisions. *Id.* at 1491. Because we held that the Voting Rights Act did not apply to citizen initiative petitions and that the involvement of state officials in the initiative process did not constitute state action, *id.* at 1490–91, we did not address whether § 203 requires a noncovered State to provide bilingual election materials to voters in a covered political subdivision.

Plaintiffs contend, however, that the following language in the introductory paragraph of *Delgado* supports their position: "[t]he controlling provision of the Voting Rights Act requires a state which distributes 'materials or information relating to the electoral process' to certain bilingual political subdivisions to provide them 'in the language of the applicable language minority group as well as in the English language.'" *Id.* at 1490 (quoting 42 U.S.C. § 1973b(f)(4) (1981)). We disagree. This language in *Delgado* regarding the scope of § 203's mandate is *dicta*. *Dicta* are defined as "those portions of an opinion that are not necessary to deciding the case then before us." *See Fresh Results, LLC v. ASF Holland, B.V.*, 921 F.3d 1043, 1049 (11th Cir. 2019) (quoting *United States v. Caraballo-Martinez*, 866 F.3d 1233, 1244 (11th Cir. 2017)). "Although our holdings are precedential, our dicta are not." *Id.* "The holding of a case comprises both 'the result of the case and those portions of the opinion necessary to that result.' But the 'holding' of a prior decision can reach only as far as the facts and

circumstances presented to the Court in the case which produced that decision." *Caraballo-Martinez*, 866 F.3d at 1244 (citations omitted). The prefatory statement in *Delgado* that Plaintiffs rely on was not necessary to our holding that the Voting Rights Act did not apply to the facts and circumstances presented in that case. It is *dicta*, and we are not bound by it. *See id.; see also McNely v. Ocala Star-Banner Corp.*, 99 F.3d 1068, 1077 (11th Cir. 1996) ("[W]e are not required to follow dicta contained in our own precedents").

We thus turn to the issue before us—an issue which this Court has not previously addressed—whether Sections 203(b) and 203(c) of the Voting Rights Act apply to different entities. Our role in this endeavor is to give the statute a "fair reading." *See* Antonin Scalia & Bryan A. Garner, *Reading Law* 3 (2012) ("In an age when democratically prescribed texts (such as statutes. . . ) are the rule, the judge's principal function is to give those texts their fair meaning."); *see also Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1143 (2018) ("Even if Congress did not foresee all of the applications of the statute, that is no reason not to give the statutory text a fair reading.").

We start, as always, with the language of the statute itself. *United States v. Forey-Quintero*, 626 F.3d 1323, 1325 (11th Cir. 2010) ("Because this is solely a matter of statutory interpretation, we must start with the language of the statute itself."). "If the statute's meaning is plain and unambiguous, there is no need for further inquiry." *United States v. One 1990 Beechcraft, 1900 C Twin*

*Engine Turbo-Prop Aircraft*, 619 F.3d 1275, 1278 (11th Cir. 2010) (quoting *United States v. Silva*, 443 F.3d 795, 797–98 (11th Cir.2006)).

"When examining the plain and ordinary meaning of a statute, 'one of the ways to figure out that meaning is by looking at dictionaries in existence around the time of enactment.'" *United States v. Chinchilla*, 987 F.3d 1303, 1308 (11th Cir. 2021) (quoting *EEOC v. Catastrophe Mgmt. Sols.*, 852 F.3d 1018, 1026 (11th Cir. 2016)). Moreover, "[i]n ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole." *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988); *see also* Scalia & Garner, *supra* at 167 ("Perhaps no interpretive fault is more common than the failure to follow the whole-text canon which calls on the judicial interpreter to consider the entire text, in view of its structure and of the physical and logical relation of its many parts."). "Under the whole-text canon, courts should 'consider the entire text [of a statute], in view of its structure and of the physical and logical relation of its many parts,' when interpreting any particular part of the text." *In re Cumbess*, 960 F.3d 1325, 1333–34 (11th Cir. 2020) (alteration in original) (quoting *Regions Bank v. Legal Outsource PA*, 936 F.3d 1184, 1192 (11th Cir. 2019)).

The plain and ordinary language of the statute, read in light of this well-accepted canon, leads us to conclude that § 203 cannot be read in the way suggested by Plaintiffs. Turning first to

dictionaries in existence around the time of § 203's enactment, "subject to" means: "[i]n a state of subjection or dependence; under the control, rule, or influence of something; subordinate . . . to the power, law, command, etc. of another"[5]; "[u]nder the power or authority of another"[6]; and "[l]iable, subordinate, subservient, inferior, obedient to; governed or affected by."[7]

With these definitions in mind, a State that is "subject to the prohibition of" § 203(b) is one that is "subordinate to" the prohibition, "under the power or authority" of the prohibition, and "governed or affected" by the prohibition—in other words, a State that itself must directly comply with § 203(b)'s prohibition.  Plaintiffs' reading that the State of Georgia is "affected by" § 203(b) because it has within its borders a county that must comply with § 203(b)'s prohibition fails to take into account this sense: "subject to" means that the State itself must be under or governed by the statute's command because it meets the statutory criteria established by Congress in § 203(b).  While the drafters used slightly different language in subsections (b) and (c), the language refers to the same entities. That is, the only entities "subject to the prohibition" of § 203(b) are the "covered" States or political subdivisions themselves, and therefore only those entities must comply with the mandate of

---

[5] *Subject*, *Oxford English Dictionary* (1st ed. 1933) (reprinted in 1978).

[6] *Subject*, *American Heritage Dictionary of the English Language* (1976).

[7] *Subject To*, *Black's Law Dictionary* (4th ed. 1968) and (5th ed. 1979).

§ 203(c).  It is undisputed that the State of Georgia is not a "covered State" for purposes of § 203(b).  As a result, Plaintiffs cannot state a cause of action against the Secretary under § 203.

Although the plain and unambiguous meaning of the language used by Congress answers the question, we note that the statutory structure, when considered as a whole, further militates against Plaintiffs' reading.  Section 203(c) mandates that voting materials be provided "in the language of the applicable minority group as well as in the English language."  But § 203(c) does not itself indicate what that additional language is.  Instead, that is left to § 203(b), which provides a language-specific formula to determine  whether a jurisdiction is "covered" based on specific population and literacy criteria.  Section 203(b)'s formula is necessary for determining the existence of "a single language minority," which, in turn, is necessary for determining the "*language of the applicable minority group*" under § 203(c). 52 U.S.C. § 10503(b)–(c) (emphasis added).  Indeed, § 203(c) expressly refers back to "subsection (b) of this section," providing a further clue to the reader that the States, political subdivisions, and language of the applicable minority groups referred to in § 203(c) are the same "covered" jurisdictions and "single language" minority groups outlined in § 203(b).  Simply put, § 203(c), either expressly or by natural implication, repeatedly refers the reader back to § 203(b), further confirming our conclusion that Subsections (b) and (c) can only plausibly be read together to apply to the same entities.

If Plaintiffs' reading were correct, Congress' express limitation of § 203(b)'s prohibition to "covered" jurisdictions would be meaningless, or at least something very different from what the statute's plain language provides. Under § 203(b), the prohibition on providing English-only materials applies only to States or political subdivisions that meet the statutory formula's criteria. If a State or political subdivision does not meet those criteria, Congress has imposed no limitation under § 203(b) on that entity's ability to provide voting materials only in English. But under Plaintiffs' reading of § 203(c), there is now some in-between status: a State that does not meet § 203(b)'s statutory criteria but nevertheless is prohibited from providing "voting materials only in the English language" in some parts of its territory. That reading cannot be squared with the statutory text of § 203(b) and provides further confirmation that Plaintiffs' reading of § 203(c) as sweeping in jurisdictions on a broader basis than § 203(b) is incorrect.

Plaintiffs cite the United States Attorney General's interpretations of § 203 in support of their reading of the statute, noting that the Supreme Court has said that the Attorney General's "interpretation of the Voting Rights Act is entitled to considerable deference." *See City of Pleasant Grove v. United States*, 479 U.S. 462, 468 (1987). Specifically, Plaintiffs cite 28 C.F.R. § 55.9, which provides that "[w]here a political subdivision (e.g., a county) is determined to be subject to . . . section 203(c), all political units that hold elections within that political subdivision (e.g., cities, school

districts) are subject to the same requirements."[8]  This regulatory interpretation cannot, however, be construed as reading the statute in the way Plaintiffs propose.  It merely says that when a covered political subdivision itself contains smaller political units, such as cities and school districts, those smaller political units must also provide bilingual voting materials if they hold elections.  That is, the greater includes the lesser.  But Plaintiffs ask us to assume that because the greater includes the lesser, the lesser—here, Gwinnett County—includes the greater—the State of Georgia.  Neither the statute nor the Attorney General's interpretation support this conclusion.

Applying the facts of this case to § 203, only Gwinnett County is prohibited, under § 203(b), from providing materials "only in the English language," and only Gwinnett County is required, under § 203(c), to provide bilingual voting materials in English and Spanish.  Section 203(c) does not apply to the State of Georgia unless and until it becomes a "covered" jurisdiction pursuant to the formula set forth in § 203(b).  Further, § 203(c) only applies to Gwinnett County when it "provides" voting materials, i.e., when

---

[8] Plaintiffs also cite 28 C.F.R. § 55.19(a), which provides that "[a] jurisdiction required to provide minority language materials is only required to publish in the language of the applicable language minority group materials distributed to or provided for the use of the electorate generally."  That regulation, however, merely identifies what materials must be distributed in the relevant language; it does not address what entity is subject to § 203(c).

it furnishes or supplies[9] the materials.  Nothing in the statute requires Gwinnett County to translate voting materials provided by another entity.  *See* 52 U.S.C. § 10503(c).  Thus, Secretary Raffensperger does not violate § 203 by maintaining English-only voting materials and information on his website because the State of Georgia is not a "covered" jurisdiction under § 203(b).  And the Gwinnett County Board of Elections does not violate § 203 by failing to translate voting materials and other information provided by the Secretary of State.

In addition to their allegations regarding voting materials provided by Secretary Raffensperger, Plaintiffs also allege that the Gwinnett County Board of Elections' website provides inadequate access to a bilingual absentee ballot application.  While Plaintiffs concede that the Gwinnett County Board of Elections' website allows users to translate the application into Spanish, they allege that accessing the translation function is not obvious and that the translations themselves are not accurate enough.

As a preliminary matter, it is unclear from the pleadings whether these allegations form the basis of Plaintiffs' claim under § 203.  The Gwinnett County Board of Elections' website is not itself referenced in Count I.  The allegations in Count I that relate to

---

[9] *Provide*, *American Heritage Dictionary of the English Language* (1976) ("To furnish; supply."); *Provide*, *Black's Law Dictionary* (4th ed. 1968) ("To supply."); *Provide*, *Oxford English Dictionary* (1st ed. 1933) (reprinted in 1978) ("To supply or furnish for use; to yield, afford.").

20-14540                Opinion of the Court                    39

absentee ballot applications refer only to the two rounds of applications mailed by Secretary Raffensperger, the alleged ongoing violations of § 203 refer only to voting materials and information provided by the Secretary, and Plaintiffs' prayer for relief does not refer to the Gwinnett County Board of Elections' website.[10]

Nonetheless, assuming that some part of Plaintiffs' claim under § 203 relates to the alleged deficiencies in the Gwinnett County Board of Elections website's Spanish translation of the absentee ballot application, Plaintiffs fail to plead facts to support their conclusions. That Spanish-speaking voters have to click a button to translate the webpage from English to Spanish does not render the website "only in the English language." *See* 52 U.S.C. § 10503(b)(1). We take judicial notice that the website offers Gwinnett County voters fifteen languages other than English in which to view its website, including Spanish. *See Gwinnett Elections*, https://www.gwinnettcounty.com/web/gwinnett/Departments/Elections (last visited May 10, 2022). The "English >" button, which is a commonly used indicator of a website translation option, clearly represents the language in which the webpage appears upon initially visiting the page and invites the viewer to see what other languages are available.

---

[10] The same is true for Count II, Plaintiffs' claim asserting a violation of § 4(e), and Plaintiffs' prayer for relief as it relates to § 4(e).

In summary, because the State of Georgia is not a covered jurisdiction under § 203(b), Secretary Raffensperger is not required to provide bilingual voting materials under § 203(c). While § 203(c) requires Gwinnett County to provide its voting materials in both English and Spanish, it does not require Gwinnett County to translate voting materials provided by the Secretary. And Plaintiffs failed to plead facts to support its conclusory allegations that the Gwinnett County Board of Elections provides English-only voting materials, specifically absentee ballot applications, on its website. For these reasons, the district court correctly concluded that Plaintiffs failed to state a claim upon which relief could be granted.

### 2.  *Section 4(e) of the Voting Rights Act*

Section 4(e) was enacted as part of the Voting Rights Act in 1965. In § 4(e)(1), Congress invoked its enforcement power under § 5 of the Fourteenth Amendment to the United States Constitution,[11] and declared that in order to secure the rights of "persons educated in American-flag schools in which the predominant classroom language was other than English, it is necessary to prohibit the States from conditioning the right to vote of such persons on ability to read, write, understand, or interpret any matter in the English language." 52 U.S.C. § 10303(e)(1). Section 4(e)(2), in turn, sets forth that prohibition:

---

[11] "The Congress shall have the power to enforce, by appropriate legislation, the provisions of this article." U.S. Const. amend XIV, § 5.

> No person who demonstrates that he has successfully completed the sixth primary grade in a public school in, or a private school accredited by . . . the Commonwealth of Puerto Rico in which the predominant classroom language was other than English, shall be denied the right to vote in any Federal, State, or local election because of his inability to read, write, understand, or interpret any matter in the English language . . . .

*Id.* § 10303(e)(2).

The district court determined that Plaintiffs' § 4(e) claim failed on the merits as to Gwinnett County because: (i) Gwinnett County consistently provided all voting materials in Spanish and was under no duty to translate the voting materials provided by a noncovered jurisdiction, here, the State of Georgia, (ii) "Gwinnett County provided Plaintiffs with absentee-ballot applications in bilingual form after the Secretary's distribution," and (iii) "Plaintiffs have been unable to establish that Gwinnett County is otherwise preventing its voters from voting in person on Spanish ballots in any future elections." The district court determined that Plaintiffs' § 4(e) claim failed on the merits as to the Secretary because Secretary Raffensperger's actions "d[id] not amount to 'conditioning the right to vote' on being able to read or understand English."

Like § 203, § 4(e) of the Voting Rights Act has not been construed by this Court or the Supreme Court in a case involving factual allegations similar to the allegations present here. We start, as

we must, with the statutory text. The relevant text at issue in this case states that no person described in § 4(e)(2) "shall be denied the right to vote in any Federal, State, or local election *because of* his inability to read, write, understand, or interpret any matter in the English language." 52 U.S.C. § 10303(e)(2) (emphasis added). Unlike § 203, the text of § 4(e) contains an express causation requirement. "The words 'because of' mean 'by reason of: on account of.'" *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009) (quoting 1 *Webster's Third New International Dictionary* 194 (1966)) (interpreting the words "but for" in 29 U.S.C. § 623(a)(1)). "Thus, the ordinary meaning of" § 4(e)(2)'s prohibition on depriving a person protected by that statute of his right to vote "because of" his inability to read, write, or understand English "is that [such inability] was the 'reason'" he was denied the right to vote. *See id.* "It follows, then" that under § 4(e)(2) "the plaintiff retains the burden of persuasion to establish that" inability to read, write, understand, or interpret English "was the 'but-for' cause of the" State's denial of his right to vote. *See id.* at 177.

At the outset, and for the reasons discussed in our consideration of standing, *see supra*, Section III.A., the allegations relating to the Secretary's mailings of English-only absentee ballot applications, and the Gwinnett County Board of Elections' failure to translate them into Spanish, are moot. We therefore consider whether the allegations of ongoing violations of § 4(e) sufficiently establish a cause of action under the statute.

Plaintiffs allege that Defendants violate § 4(e) on an ongoing basis by disseminating: "English-only press releases and all other election-related information published on the Secretary of State's website, English-only voter precinct cards accessible to individuals logging on to the Georgia My Voter Page, and the English-only election-related notices, instructions, and supplies to nursing homes, among other items" provided by the Secretary of State. Plaintiffs further allege that these activities violate § 4(e) because the right to vote under § 4(e) "encompasses the right to an effective vote" and that this "requires that jurisdictions provide instructions, ballots, and 'any other material which forms part of this official communication to registered voters prior to an election' in [the] Spanish language."

As Plaintiffs point out, courts have described the right to vote under § 4(e) as encompassing "the right to an effective vote," i.e., "the right to cast effective votes for the candidate of [the voter's] choice." *See, e.g.*, *Puerto Rican Org. for Pol. Action v. Kusper*, 490 F.2d 575, 580 (7th Cir. 1973) (quoting *United States v. Post*, 297 F. Supp. 46, 51 (W.D. La. 1969)). In *Kusper*, the Seventh Circuit affirmed a district court's preliminary injunction ordering local elections commissioners "to print Spanish translations of directions for using voting machines to be pasted over English instructions on specimen ballots," to put up Spanish-language posters advising about the availability of assistance, and to provide Spanish-language instruction cards for model voting machines in certain polling places located within precincts in eleven wards. *Id.* at 576–

77, 580. In addition, the elections commissioners were ordered to "make all reasonable efforts" to recruit and place bilingual elections judges at those same polling places. *Id.* at 577. The district court ordered relief under § 4(e) after finding that protected voters in those polling places did "not understand enough English to be able to vote effectively unless they ha[d] written instructions or verbal assistance in Spanish." *Id.* at 576. In affirming the injunction, the Seventh Circuit looked at district court decisions considering what the right to vote under § 4(e) entailed. *Id.* at 579. Analogizing it to the situation of an illiterate voter, the court noted that it was implausible that such voter has the right to "pull the lever of a voting machine, but not the right to know for whom he pulls the lever." *Id.* at 579 (quoting *United States v. Louisiana*, 265 F. Supp. 703, 708 (E.D. La. 1966)), *aff'd sub nom. Louisiana v. United States*, 386 U.S. 270 (1967)). Thus, by analogy, under § 4(e), "a Spanish-speaking Puerto Rican is entitled to assistance in the language he can read or understand." *Id.* at 580.

This case does not require us to delineate the boundaries of permissible and impermissible conduct under § 4(e). For while the right to vote protected by § 4(e) involves not only the mechanics of casting one's ballot but also the ability to understand what is on the ballot, that does not mean that § 4(e) requires *all* voting-related materials or information to be provided in both English and Spanish, nor does it relieve a party from pleading the causation element required by § 4(e)'s text.

Here, Plaintiffs allege that the Secretary provides press re-
leases and all other voting-related information on his website, as
well as voter precinct cards on the Georgia My Voter Page, only in
English.  At the same time, however, Plaintiffs allege that the
Gwinnett County Board of Elections mailed the individual Plain-
tiffs bilingual absentee ballot applications, which they were able to
complete, that the Gwinnett County Board of Elections provides a
bilingual absentee ballot application on its website, that the website
itself has an English-to-Spanish translation function, and that
county boards of registration and elections separately provide vot-
ers with precinct cards when they register to vote.  Additionally,
Plaintiffs allege that the "Defendants have provided bilingual ab-
sentee ballots to Gwinnett County voters for the June 9, 2020 pri-
mary election."  Read together, Plaintiffs' allegations relating to the
Secretary's website and voter precinct cards are insufficient to
plead that, but for the Secretary's English-only materials and infor-
mation, a Gwinnett County voter protected by § 4(e) was or will
be denied the ability to vote.

Plaintiffs' allegations regarding nursing homes located in
Gwinnett County are a closer call.  Plaintiffs allege that the Secre-
tary is responsible for providing nursing homes with certain elec-
tion-related training and materials, and that the "election-related
notices, instructions, and supplies . . . among other items" provided
by the Secretary are only in English.  There are no allegations re-
garding what, if any, voting materials (e.g., registration materials,
absentee ballot applications) the Gwinnett County Board of

Elections provides to residents in those nursing homes. But even assuming that some of the residents of those nursing homes are protected by § 4(e), Plaintiffs' allegations suffer from the same deficiency as their allegations relating to the quality of the English-to-Spanish translation function of the Gwinnett County Board of Elections' website. We have no way of knowing what the "notices, instructions, and supplies"—much less the "other items"—referred to in Plaintiffs' pleading consist of in order to determine whether they are the kinds of materials that, because they are in English only, could plausibly be the reason a voter protected by § 4(e) was or will be unable to cast his vote. In contrast, we do know from Plaintiffs' allegations that materials unquestionably necessary to vote—absentee ballots—were provided in both English and Spanish to all of Gwinnett County's voters. And there is no allegation that a voter protected by § 4(e) was or will be unable to cast his absentee ballot because of the English-only materials provided to his nursing home. Plaintiffs' allegations regarding the materials provided by the Secretary to nursing homes in Gwinnett County are simply too general and conclusory to allege a violation of § 4(e). *See Gill*, 941 F.3d at 515.

In summary, there are no allegations that Gwinnett County voters protected by § 4(e) were or plausibly will be unable to vote because of or on account of the Secretary's English-only information posted on his website and the English-only precinct cards available on the Georgia My Voter Page. Additionally, Plaintiffs failed to plead facts to support their general allegations regarding

election-related items provided by the Secretary to nursing homes in Gwinnett County.  For these reasons, the district court correctly concluded that Plaintiffs failed to state a claim under § 4(e).

### C.  Plaintiffs' Motion for Leave to File a Supplemental Complaint.

The decision whether to grant a motion for leave to file supplemental pleadings is generally within the discretion of the district court.  *See* Fed. R. Civ. P. 15(d).  We review a district court's denial of a motion for leave only for abuse of discretion, *Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1211 (11th Cir. 2008), but we review *de novo* whether a supplemental pleading would be futile, *see Cockrell v. Sparks*, 510 F.3d 1307, 1310 (11th Cir. 2007).  A supplemental pleading is futile "when the claim, as amended, would still be subject to dismissal." *Boyd v. Warden, Holman Corr. Facility*, 856 F.3d 853, 864 (11th Cir. 2017).

Before the district court ruled on Defendants' motions to dismiss, Plaintiffs sought leave to file a supplemental complaint with additional factual allegations relating to two developments: (1) Secretary Raffensperger had unveiled a new, English-only absentee ballot application portal, which the Gwinnett County Board of Elections was encouraging voters to use through a link on its website, and (2) the Gwinnett County Board of Commissioners rejected a proposal, which had been supported by the Gwinnett County Board of Elections, to mail bilingual absentee ballot applications to active voters in Gwinnett County.  Together, Plaintiffs

asserted, that these developments constituted further violations of §§ 203 and 4(e).  In its order granting the motions to dismiss, the district court concluded that "[n]othing in Plaintiffs' Motion to File a Supplemental Complaint alter[ed]" its conclusions.

We cannot conclude that the district court abused its discretion in denying the motion for leave to file a supplemental complaint.  For the reasons previously discussed, the Secretary is not subject to the requirements of § 203, and § 203 does not require the Gwinnett County Board of Elections to translate into Spanish voting-related materials provided by the Secretary.

Turning to § 4(e), there is no question that using the Secretary's portal to file an absentee ballot application may be more convenient for many voters, and Plaintiffs also allege that the portal provides a voter with a printed confirmation that his application was filed.  But that is not enough to state a cause of action for violation of § 4(e).  This supplemental allegation does not demonstrate that the additional resources provided on the Secretary's website amount to effectively conditioning the right to vote on the ability to read and understand English.  Moreover, Plaintiffs' proposed supplemental complaint does not deny that the Gwinnett County Board of Elections provides a bilingual absentee ballot application on its own website and that the website also has an English-to-Spanish translation function.  Because those allegations would remain part of Plaintiffs' pleadings even if the motion for leave had been granted, Plaintiffs' complaint does not allege that certain

voters were denied the right to vote based on their inability to read and understand English. And, as already discussed above, even assuming that Plaintiffs' allegations regarding the website's deficiencies form part of their claim under § 4(e), those allegations are insufficient to support a cause of action. Thus, Plaintiffs have not pleaded the causation required by § 4(e) between the Secretary's English-only absentee ballot application portal and the denial of the right to vote.

Finally, neither § 203 nor § 4(e) require the Gwinnett County Board of Commissioners or the Gwinnett County Board of Elections to provide absentee ballot applications, or any particular voting material for that matter, only that those voting materials that *are* provided comply with the statutory mandates. Significantly, the proposed supplemental complaint does not allege that the Gwinnett County Board of Elections (or Board of Commissioners) mailed *English-only* absentee ballot applications. Absent any statutory mandate that the Gwinnett Board of Elections mail bilingual ballot applications, there is no claim under either § 203 or § 4(e) for its failure to do so.

Because the additional allegations in Plaintiffs' proposed supplemental complaint would not have stated causes of action under either § 203 or § 4(e), the amendment would have been futile. The district court therefore did not abuse its discretion in failing to grant Plaintiffs leave to file.

## IV.    CONCLUSION

For the reasons discussed above, the district court erred in concluding that Plaintiffs lacked standing—GALEO sufficiently pleaded standing under a diversion of resources theory, and while some of Plaintiffs' claims were moot, others remained live and amenable to meaningful relief from the court. We therefore vacate the district court's dismissal of the suit pursuant to Rule 12(b)(1). The district court was correct, however, in concluding that Plaintiffs failed to state causes of action under either § 203 or § 4(e) of the Voting Rights Act and in not granting Plaintiffs leave to file their proposed supplemental complaint. We therefore affirm the district court's dismissal of the suit pursuant to Rule 12(b)(6) and its denial of leave for Plaintiffs to file the supplemental complaint pursuant to Rule 15(d).

**VACATED in part, AFFIRMED in part.**